

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**     JUDGE GRADY

**EASTERN DIVISION**

**01C 1243**

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff-Respondant, | ) | Case No. 01 C ____ |
| | ) | |
| v. | ) | Case No. 97 CR 415 |
| | ) | |
| Salvatore Lorefice, | ) | |
| | ) | Hon. John F. Grady |
| | ) | |
| Defendant-Movant. | ) | |

**Prisoner Number & Place of Confinement:**
Reg. No. 11292-424, FPC Terre Haute
(Clerk of Court take note: movant is represented by counsel)

DOCKETED
FEB 2 6 2001

<u>**MOTION TO VACATE SENTENCE**</u>

**1. Name and location of court which entered the judgment of conviction under attack.**
United States District Court, Northern District of Illinois; Chicago, Illinois.

**2. Date of judgment of conviction.** Sentence imposed August 26, 1998; Judgment signed and filed August 26, 1998, entered August 31, 1998.

**3. Length of Sentence.** 57-month term of imprisonment, followed by three years' supervised release, a $50,000 fine, $700 special assessments, and $600,000 in restitution.

**4. Nature of offense involved (all counts)** The seven-count indictment charged Salvatore Lorefice with four counts of mail fraud (Counts One, Four, Five, and Seven), in violation of 18 U.S.C. § 1341, and three counts of wire fraud, in violation of 18 U.S.C. § 1343 (Counts Two, Three and Six).

**5. What was your plea? (Check one)** Not guilty.

**If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or indictment, give details:**

**6. Kind of trial.** Jury

**7. Did you testify at the trial?** No.

**8. Did you appeal from the judgment of conviction?** Yes

**9. If you did appeal, answer the following:**

    **(a) Name of court**: United States Court of Appeals for the Seventh Circuit.

    **(b) Result**: Judgment of conviction and sentence affirmed.

    **(c) Date of result:**  September 16, 1999; timely filed petition for rehearing and rehearing *en banc* denied on October 25, 1999.  The Court of Appeals' opinion is reported at 192 F.3d 647 (7th Cir. 1999).  On February 28, 2000, the Supreme Court denied a timely-filed petition for writ of certiorari.  That denial is reported at 120 S.Ct. 1246, 146 L.Ed.2d 104 (2000).

**10.  Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications or other motions with respect to this judgment in any federal court?**  No.

**11.  If your answer to 10 was "yes," give the following information:**

    **(a)**    **(1) Name of court** .

            **(2) Nature of proceeding.**

            **(3) Grounds raised.**

            **(4) Did you receive an evidentiary hearing on your petition, application or motion?**

            **(5) Result.**

            **(6) Date of result.**

    **(b) As to any second petition, application or motion give the same information:**

            **(1) Name of court.**

            **(2) Nature of proceeding.**

            **(3) Grounds raised.**

            **(4) Did you receive an evidentiary hearing on your petition, application or motion?**

            **(5) Result.**

            **(6) Date of result.**

(c) As to any second petition, application or motion give the same information:

    (1)  Name of court.

    (2)  Nature of proceeding.

    (3)  Grounds raised.

    (4)  Did you receive an evidentiary hearing on your petition, application or motion?

    (5)  Result.

    (6)  Date of result.

(d) Did you appeal, to an appellate federal court having jurisdiction, the result of action taken on any petition, application or motion?

    (1)  First petition, etc.

    (2)  Second petition, etc.

    (3)  Third petition, etc.

(e) If you did not appeal from the adverse action on any petition, application or motion, explain briefly why you did not:

12. State **concisely** every ground on which you claim that you are being held in violation of the constitution, laws or treaties of the United States. Summarize **briefly** the **facts** supporting each ground. If necessary, you may attach pages stating additional grounds and **facts** supporting the same.

    **A. Ground one:** Denial of due process at sentencing, because the district court imposed sentence based on materially inaccurate facts.

        **Supporting FACTS (tell your story briefly without citing cases or law):**

    The district court imposed a sentence at the uppermost end of the applicable guideline range without knowing that Mr. Lorefice suffered from significantly reduced mental capacity and chronic alcoholism. (Exhibit A). The district court stated in pertinent part:

> I am totally convinced that the defendant is a basically dishonest person who has been guilty of an egregious fraud . . .

Sent. Tr. 32-33.

The district court developed a strong view of the facts of the case, including the personality and character of the defendant, and based its sentence thereon. However, the court's impression of the defendant is inaccurate and is based upon incomplete and misleading information. At sentencing, the district court was not informed of significant evidence that defendant suffered from significantly diminished mental capacity and alcoholism. The lack of such evidence left the court with an inaccurate picture of his personality, character and the facts surrounding the offense. Had such evidence been presented, there is a reasonable probability that the court would have imposed a lower sentence.

The failure to present accurate information at sentencing also resulted in a materially inaccurate and incomplete presentence investigation report. The inaccuracies in the report have resulted in the Bureau of Prisons refusing to allow defendant to enter a residential drug program. Had the BOP accepted defendant into the BOP's residential drug program, he would be eligible for up to a year's reduction in his term of imprisonment once he completed the program, as provided by 18 U.S.C. § 3621(e)(2)(B).

**B. Ground two:** The Pre-Sentence Investigation Report should be corrected to reflect Mr. Lorefice's longstanding alcohol dependency.

**Supporting FACTS (tell your story briefly without citing cases or law):**

Salvatore Lorefice has abused alcohol for many years. Although he denied having a drinking problem when he was interviewed by the probation officer as part of the pre-sentence investigation, the PSI should now be corrected to reflect the truth, so that Mr. Lorefice may participate in the BOP's residential drug treatment program.

4

13. **If any of the grounds listed in 12A, B, C, and D were not previously presented, state briefly what grounds were not so presented, and give your reasons for not presenting them.**

14. **Do you have any petition or appeal now pending in any court as to the judgment under attack?** No.

15. **Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked herein:**

    **(a) At preliminary hearing** N/A

    **(b) At arraignment and plea** Cole & Staes Ltd., 321 South Plymouth Court, Suite 1150, Chicago, IL 60604

    **(c) At trial**: Michael D. Monico, Esq., Jacqueline Sharon Jacobson, Esq., Monico, Pavich & Spevack, 29 South LaSalle Street, Suite 720, Chicago, IL 60603

    **(d) At sentencing** First, Michael D. Monico, Esq., Jacqueline Sharon Jacobson, Esq., Monico, Pavich & Spevack, 29 South LaSalle Street, Suite 720, Chicago, IL 60603; and then Mark L. Rotert, Esq., James R. Thompson, Esq., Michael B. Johnson, Esq., Winston & Strawn, 35 West Wacker Drive, 41st Floor, Chicago, IL 60601

    **(e) On appeal.** Mark L. Rotert, Esq., James R. Thompson, Esq., Michael B. Johnson, Esq., Winston & Strawn, 35 West Wacker Drive, 41st Floor, Chicago, IL 60601

    **(f) In any post-conviction proceeding**: Alan Ellis, Esq., James H. Feldman, Jr., Esq., Law Offices of Alan Ellis, 50 Rittenhouse Place, Ardmore, PA 19003.

    **(g) On appeal from any adverse ruling in a post-conviction proceeding**: N/A

16. **Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at approximately the same time?** Yes

17. **Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack?** No.

    (a) **If so, give the name and location of court which imposed sentence to be served in the future.**

    (b) **Give date and length of the above sentence:**

    (c) **Have you filed, or do you contemplate filing, any petition attacking the judgment which imposed the sentence to be served in the future?**

    WHEREFORE, for the foregoing reasons, the defendant prays that this Court:

    a. Direct that an Answer be filed pursuant to Fed.R.Gov. § 2255 P. 4(b); and then, after hearing,

    b. Vacate the defendant's sentence and resentence him.

Dated: February 23, 2001

                         Respectfully submitted,

                         SALVATORE LOREFICE

Local Counsel

WINSTON & STRAWN               LAW OFFICE OF ALAN ELLIS

By:_____        By:_____
JAMES R. THOMPSON                ALAN ELLIS
MICHAEL B. JOHNSON            34 Issaquah Dock
35 West Wacker Drive            Sausalito, CA 94965
Chicago, IL 60601               (415) 332-6464
(312) 558-5600

Attorneys for the Defendant-Movant

<u>VERIFICATION</u>

Pursuant to 28 U.S.C. §§ 1746 and Fed.R.Gov. 2255 Proc. 2(b), Salvatore Lorefice declares, under penalty of perjury, that:

1. I have read the foregoing Motion to Vacate, Set Aside, or Correct Sentence, in which I am the defendant-movant.

2. I know that the factual allegations contained in the motion are true.

3. With respect to facts alleged in the motion upon information and belief, I believe these factual allegations to be true.

4. I declare under penalty of perjury that this Verification is true and correct.

_Salvatore Lorefice_
Salvatore Lorefice

Dated: _____, 2001
At: Terre Haute, IN

# EXHIBIT  A



**FILE**

RECD OCT 23 2000

## ISAAC RAY CENTER, INC.
1725 West Harrison Street, Suite 110
Chicago, Illinois 60612
(312) 829-8021
Facsimile: (312) 829-1476

James L. Cavanaugh, Jr., M.D.
*Chairman of the Board*
*President*

Consultants in Behavioral Risk Management

Peter M. Fink, M.D.
Vice President
Fee for Services Operations and
Child & Adolescent Forensic Services

Medical Director, Special Projects

October 16, 2000

Mr. Allan Ellis
Attorney at Law
34 Issaquah Dock
Waldo Point Harbor
Sausalito, California 94965

Re:     Mr. Salvatore Lorefice
        DOB: 12/02/34
        Reg. No.: 11292-424

Dear Mr. Ellis:

After having received Dr. Wasyliw's 8/01/00 psychological testing report, I am providing the following update to my 7/20/00 preliminary report. As before the interviews conducted (see "Sources of Information") and records reviewed (see "Sources of Information"), form the basis for my opinions. All opinions provided are to a reasonable degree of medical psychiatric certainty. As this is a preliminary report, if additional interviews, records, test results, or testimony become available, then my opinions and/or recommendations may change.

Salvatore Lorefice Report
October 16, 2000
Page 2 of 6

## OPINIONS:

- Mr. Lorefice suffers from mental disorders.

- Mr. Lorefice is not malingering or grossly exaggerating any mental disorder or deficits.

- Mr. Lorefice suffers from the following major psychiatric disorders:[1]

  - Major Depression Recurrent, Severe, Without Psychotic Features.

  - Generalized Anxiety Disorder.

  - Alcohol Abuse and Dependence in Current Remission, Severe.

  - Alcohol-Related Disorder Not Otherwise Specified with Substance-Induced Prefrontal Syndrome.

  - Marijuana Abuse in Remission.

- In addition, Mr. Lorefice suffers from the following personality traits and features.[2]

  - Dependent Personality Disorder with Avoidant Personality Traits.

- Mr. Lorefice does not demonstrate a pattern of psychological test findings commonly associated with individuals predisposed to antisocial or criminal behavior.

- Neuropsychological assessment reveals a distinct pattern of frontal lobe dysfunction with variable concentration but without significant memory impairment.

- In addition to being the cause of his frontal lobe dysfunction, Mr. Lorefice's alcohol abuse and dependence would have aggravated the consequences of his frontal lobe dysfunction, namely

---

[1] Major psychiatric disorders include major depression, manic-depressive or bipolar disorder, schizophrenia, and organic brain syndromes.

[2] According to the **Diagnostic and Statistical Manual, 4th Edition** (DSM-IV), American Psychiatric Association, Washington, D.C., 1994: "*Personality traits* are enduring patterns of perceiving, relating to, and thinking about the environment and oneself that are exhibited in a wide range of social and personal contexts. Only when *personality traits* are *inflexible* and *maladaptive* and *cause significant functional impairment* or *subjective distress* do they constitute Personality Disorders.

The essential feature of a Personality Disorder is an enduring pattern of inner experience and behavior that deviates markedly from the expectations of the individual's culture and is manifested in at least two of the following areas: cognition, affectivity, interpersonal functioning, or impulse control (Criterion A). This enduring pattern is inflexible and pervasive across a broad range of personal and social situations (Criterion B) and leads to clinically significant distress or impairment in social, occupational, or other important areas of functioning (Criterion C). The pattern is stable and of long duration, and its onset can be traced back at least to adolescence or early adulthood (Criterion D). The pattern is not better accounted for as a manifestation or consequence of another mental disorder (Criterion E) and is not due to the direct physiological effects of a substance (e.g., a drug of abuse, a medication, exposure to a toxin) or a general medical condition (e.g., head trauma) (Criterion F)...

The diagnosis of Personality Disorders requires an evaluation of the individual's long-term patterns of functioning, and the particular personality features must be evident by early adulthood. The personality traits that define these disorders must also be distinguished from characteristics that emerge in response to specific situational stressors or more transient mental states (e.g., Mood or Anxiety Disorders, Substance Intoxication). The clinician should assess the stability of personality traits over time and across different situations. Although a single interview with the person is sometimes sufficient for making the diagnosis, it is often necessary to conduct more than one interview and to space these over time. Assessment can also be complicated by the fact that the characteristics that define a Personality Disorder may not be considered problematic by the individual (i.e., the traits are often ego-syntonic). To help overcome this difficulty, supplementary information from other informants may be helpful."

preservation[3], impulsive behavior, and cognitive inflexibility.[4] It is likely that the alcohol caused his brain dysfunction leaving permanent residua that we measured during our evaluation. However, his continued heavy drinking also aggravated his cognitive problems. In fact, the current measured problems in judgement and flexibility would have been worse during his years of alcohol use than they are now.

- At the time Mr. Lorefice reportedly engaged in the behaviors that resulted in his conviction, he suffered from reduced mental capacity. His reduced mental capacity resulted from his underlying Major Depression and Generalized Anxiety Disorders, his Alcohol Abuse and Dependence Disorders, his personality traits and features, and his frontal lobe dysfunction.

- Federal Guidelines that define diminished capacity require that the defendant suffer from a significantly reduced mental capacity. The guidelines clarify the policy statement regarding significantly reduced mental capacity in the following terms.

    ""Significantly reduced mental capacity" means the defendant, although convicted, has a significantly impaired ability to (A) understand the wrongfulness of the behavior comprising the offense or to exercise the power of reason; or (B) control behavior that the defendant knows is wrongful."[5]

The above guidelines apply to Mr. Lorefice in the following way. Mr. Lorefice's use of alcohol was reportedly initially voluntary in his youth (twenties and thirties). However, at the time of the offense Mr. Lorefice suffered from multiple problems. At the time of the offense, Mr. Lorefice suffered from extreme emotional need, emotional disorders, and cognitive impairment. Consequently, Mr. Lorefice would have failed to appreciate the long-term consequences of his actions. Mr. Lorefice's protestations of innocence in this matter at the time of his trial stems from his failure to appreciate the wrongfulness of his acts due to his illness-based inability to appreciate the long-term consequences of his actions.

During our evaluation, Mr. Lorefice demonstrated defective reasoning. The type of defective reasoning demonstrated at out evaluation we believe was present at the time of the offense. Although the examples that follow do not demonstrate a reasoning defect as part of a criminal act, they demonstrate how Mr. Lorefice's defective reasoning works. We observed that Mr. Lorefice repeatedly picked on irrelevant detail that had idiosyncratic meaning to him. He then magnified the importance or relative weight of the detail, and reasoned irrational forward from that point.

- When we entered the prison grounds to begin our evaluation, Mr. Lorefice focused on the location of the physical space used for the interview. Initially, he wanted to use a certain area of the prison for the evaluation. Within steps of the entrance, Mr. Lorefice engaged in verbal argument with prison staff when they rejected his suggestion. The argument became protracted and eventually required the prison staff and us to dissuade and disengage him.

---

[3] Perseveration is the tendency to emit the same verbal, motor, or other behavioral response repeatedly to varied stimuli that should by their varied nature should result in varied responses appropriate to the stimuli.
[4] Cognitive inflexibility refers to the inability to shift concept when the situation and data dictate a change of perspective.
[5] Federal Guidelines Manual, November 1, 1998, §5K2.13, page 363.

- When finally situated in a comfortable and reasonable evaluation space, Mr. Lorefice repeatedly objected to the reasonable monitoring of the evaluation process by prison personnel, citing unreasoned and inappropriate intrusion into the evaluation space. However, the prison guards or officials were courteous, respectful of our privacy, and unobtrusive. Mr. Lorefice continued to complain despite our reassurance that we did not object.

- On the first day of the evaluation, Mr. Lorefice had offered us a recommendation of a place to eat. When told the next day that the evaluators had chosen another dining site, Mr. Lorefice repeatedly brought up the issue as if he had suffered a personal affront despite repeated reassurance that the examiners had done what they had wanted.

- When we questioned Mr. Lorefice about the pre-sentencing evaluation, Mr. Lorefice indignantly denied that he had done anything improper in terms of providing travel favors for local politicians. Mr. Lorefice launched himself into an outraged diatribe against the US Attorney and his staff. Mr. Lorefice appeared genuinely affronted that the US Attorney had questioned his integrity on the matter in question or that he had behaved improperly in any manner. As part of his digressive diatribe, Mr. Lorefice spoke about how he would speak to his attorneys about what he considered defamatory statements by the pre-sentencing evaluator that he had not known about before our evaluation.

- Furthermore, Mr. Lorefice insisted that he had not consumed alcohol at the time of his Federal criminal trial. However, according to his current attorney, Mr. Lorefice consumed alcohol during his trial. Mr. Lorefice indignantly denied any such assertion and insisted that any other version of the facts as stated by him constituted slanderous untruths.

Defects of reasoning, including faulty memory and confabulated recollections, demonstrated during the evaluation where more likely than not present and made worse at the time of the offense by Mr. Lorefice's severe alcohol dependence. Mr. Lorefice's defective reasoning allowed him to view as rational his participation in and/or condoning of signature forgery for dying employees and family members. Mr. Lorefice most likely demonstrated no forethought that these actions were inherently wrong. Instead, Mr. Lorefice acted with us as if he believed that his actions were his rightful benefit. Mr. Lorefice believed himself entitled, on the advice of his accountant, to the benefit because he (in fact it was his wife's company) had paid large premiums to the companies. Consequently, Mr. Lorefice believed that he had the right, having paid the appropriate fee, to benefit from the impending death of family members and individuals company employees.

Mr. Lorefice's outraged and indignant responses to us about his contacts with local politicians and his use of alcohol during his trial years after the events were remarkable. His statements during our evaluation radically differed from the information others provided. Furthermore, Mr. Lorefice rejected a plea agreement that would have allowed him to avoid jail time from his offense based on his illogical belief and against the advice of his attorneys that he was innocent. Instead, Mr. Lorefice reasoned illogically, that he

was innocent, truly unaware that his reasoning was wrong. Mr. Lorefice's maintained posture that he reportedly believed as the truth, most likely best served his self-image. In addition, his outrage at statements he viewed as impugning his character may represent faulty or confabulated memory occurring during a time of alcohol dependence.

- The pattern of our findings is consistent with an individual suffering from underlying major psychiatric disorders who uses alcohol to treat his symptoms.

- At the time of our evaluation, Mr. Lorefice experienced psychiatric symptoms sufficient to require active treatment with psychotropic medication and counseling.

- Mr. Lorefice most likely abused and depended upon alcohol to treat his chronic and untreated Major Depression and Generalized Anxiety Disorder. Without active and ongoing treatment now, Mr. Lorefice's current level of depression and anxiety symptoms substantially increases his risk of alcohol relapse.

- Mr. Lorefice's alcohol abuse and alcohol dependence caused brain damage amplified his inherent lack of insight about his condition impairing his capacity to help himself. His lack of insight about his psychiatric disorders and brain dysfunction was apparent during the evaluation.

- While Mr. Lorefice appears affable, outgoing, and personable he is in fact extremely anxious, has multiple somatic concerns, and prefers social avoidance as he finds extended interpersonal contact overwhelming. He is an emotionally sensitive, shy, and usually timid man. He is more passive than active in interpersonal relationships. Mr. Lorefice's personality is such that he is not the kind of person who when exposed to an intoxicant (alcohol) will develop addiction due to minimal exposure. His personality does not make him prone to physical addiction. Consequently, his alcohol abuse resulted from his major psychiatric disorder(s).

- Mr. Lorefice is extremely dependent on others who he views as authoritative and directive. Given his passivity and gullibility despite a superficial appearance of sophistication and authority, he is highly vulnerable to the manipulative machinations of others.

- Mr. Lorefice did not provide truthful information to the investigating officer who prepared the PSI. The motives for this behavior are unclear. However, lack of insight, shame, and embarrassment likely placed a substantial role in his silence about his mental state.

- If Mr. Lorefice had undergone a competent comprehensive psychiatric and neuropsychological evaluation before the PSI investigation, then the PSI would likely have reported different findings more in line with the current assessment.

## RECOMMENDATIONS:

1. Mr. Lorefice requires the services of a psychiatrist to provide psychotropic drug treatment for his major psychiatric disorders.

2. Mr. Lorefice requires placement in an intensive, alcohol rehabilitation program for additional treatment and education due to his very high risk of alcohol relapse. Mr. Lorefice's risk of relapse derives from the complex of psychiatric, neuropsychological, and personality features that we have come to understand drive his drinking behavior.

Salvatore Lorefice Report
October 16, 2000
Page 6 of 6

## SOURCES OF INFORMATION:

**Interviews Conducted:**

- 05/15/00, Interview of Ms. Bonnie Lorefice by Peter M. Fink, M.D. at the Isaac Ray Center for 0.5 hours.

- 6/08/00, Telephone Interview of Robert Adams, LCSW, by Peter M. Fink, M.D. at the Isaac Ray Center for 0.5 hours.

- 6/9/00, Telephone Interview of Frank Nadell, by Peter M. Fink, M.D. at the Isaac Ray Center for 0.5 hours.

- 6/11/00, Telephone Interview of Rev. Teri Nadell, by Peter M. Fink, M.D. at the Isaac Ray Center for 0.5 hours.

- 6/28/00, Interview of Mr. Lorefice, by Peter M. Fink, M.D. at the Federal Prison Camp, Terre Haute, Indiana for 2.5 hours.

- 6/29/00, Interview of Mr. Lorefice, by Peter M. Fink, M.D. at the Federal Prison Camp, Terre Haute, Indiana for 1.0 hours.

**Records Reviewed:**

- 6/08/98, Pre-Sentence Investigation (PSI) Report, Docket #97 CR 415-1.

- 9/16/99, US Court of Appeals for the Seventh Circuit Decision, 192 F.3d 647; 1999 U.S. App. Lexis 22457.

- 4/11/00, Letter to Honorable Judy Biggert for Margaret C. Hambrick, Regional Director, Federal Bureau of Prisons.

- 5/12/00, Letter to Honorable Judy Biggert for Margaret C. Hambrick, Regional Director, Federal Bureau of Prisons.

- 4/13/00, Administrative Remedy Regional Appeal, Part B- Response, Remedy ID No. 208150-R1, date filed 4/12/00.

- 6/00, Letter to Peter M. Fink, M.D. from, Dr. Hanna, Plastic Surgeon.

**Psychological Testing Administered:**

- 8/01/00, Psychological Test Report of the 6/28 and 6/29/00, Psychological Evaluation of Mr. Lorefice by Orest Wasyliw, Ph.D.

**Additional Information:**

- 6/12/00, Letter from Peter M. Fink, M.D. to Mr. Alan Ellis, Concerning Preliminary Findings Based on Work to Date.

If you have any questions, then please contact me at 312/829-8021.

Sincerely,

Peter M. Fink, M.D.
Board-Certified Psychiatrist, Child Psychiatrist, and Forensic Psychiatrist

**FILE**

REC'D AUG 1 4 2000



## ISAAC RAY CENTER, INC.

1720 West Polk Street
Chicago, Illinois 60612
(312) 942-4462
Facsimile: (312) 942-2224
After Hours Answering Service: (312) 829-8021

Consultants in Behavioral Risk Management

James L. Cavanaugh, Jr., M.D.
*Chairman of the Board*
*President*

Orest Eugene Wasyliw, Ph.D.
*Director*
*Adult Clinical Psychology*

August 1, 2000

Peter Fink, M.D.
Isaac Ray Center, Inc.
1720 West Polk Street
Chicago, Illinois 60612

Re: S. Lorefice

Dear Dr. Fink,

I performed a psychological evaluation of Mr. Salvitore Lorefice for the purpose of assessing the presence, nature, and extent of any psychopathology which may relate to the actions for which he has been convicted. This evaluation was performed on June 28 and 29, 2000, at the Federal Prison Farm at Terre Haute, Indiana, and consisted of a clinical interview plus the administration of the following psychometric instruments:

*Shipley Institute of Living Scale*
*Wechsler Adult Intelligence Scale-III*
*Russell 1975/88 Revision of the Wechsler Memory Scale*
*Infromation/Orientation, Mental Control, and Digit Span subtests of the*
*       Wechsler Memory Scale-III*
*Motor Functions Scale of the Luria-Nebraska Neuropsychological Battery*
*Controlled Oral Word Association Test*
*Ruff Figural Fluency Test*
*Stroop Color-Word Interference Test*
*Trailmaking Test*
*Bender-Gestalt Test, Background Interference Procedure*
*Rey Dissimulation Test*
*Individual tasks of Visual and Receptive Speech functioning*
*Minnesota Multiphasic Personality Inventory-2*
*Millon Clinical Multiaxial Inventory-II*

Peter Fink, M.D.
August 1, 2000

*Sixteen Personality Factors Questionnaire*
*Rorschach Psychodiagnostic Test*

## OBSERVATIONS and INTERVIEW

Mr. Lorefice was courteous and cooperative throughout testing, and appeared oriented in all regards. He was very sociable and easily engaged in spontaneous conversation. If anything, he seemed exceedingly anxious to please. There were no indications of unusual preoccupations or inappropriate logic. However, Mr. Lorefice's responses were often fragmented with tangential intrusions suggestive of anxiety. Otherwise, his affect showed a normal range and was appropriate to the testing situation, with no evidence of undue depression, suspiciousness, resentment, or fatigue. Mr. Lorefice understood and accepted my initial warnings as to the boundaries of confidentiality for this evaluation. Test instructions and items were easily understood, and test-taking conditions were judged as adequate for the administration of the above psychological instruments.

Since we both participated in interviewing Mr. Lorefice, I will not repeat the interview information he gave us in this report. Significant aspects of Mr. Lorefice's reported history include the following: Mr. Lorefice is a sixty-four year old, married, right-handed white male who has 12 years of education. Mr. Lorefice reported a history of excessive alcohol use spanning over thirty years. Mr. Lorefice has also had long-standing problems with anxiety and depression that have caused or contributed to his alcohol abuse. His drinking worsened in the late 1980's and early 1990's, when he suffered the death within the same month of his mother, brother, and sister. He drank socially but did not usually drink to excess until about the age of 45. Thereafter, he reportedly drank half a fifth to a quart of hard liquor per day. He suffered numerous blackouts, pass outs, and falls, at times striking his head. He also suffered withdrawal symptoms after he quit. He consulted a plastic surgeon in 1988 because his eyes had become so puffy that he had trouble keeping them open. His doctor told him that the puffy periorbital skin most likely resulted from excessive alcohol use. Mr. Lorefice also reported several DUIs. An older brother died from the consequences of chronic and severe alcohol abuse. Mr. Lorefice abused marijuana in the 1990's. He stopped in 1995 after repeated paranoid reactions to marijuana. This constituted a change from the previously relaxing effect of this drug. Mr. Lorefice took Valium since the 1980's to treat his anxiety and alcohol withdrawal symptoms. Mr. Lorefice had a heart attack in the late 1970's and spent several weeks recuperating in the hospital.

## Psychological Test Findings

### A. Neuropsychological Assessment.

Mr. Lorefice devoted adequate attention and effort to testing. He appeared highly motivated on tests that were easy or looked familiar to him, but gave up quickly when difficulty or effort

Peter Fink, M.D.                                                      Re: <u>S. Lorefice</u>
August 1, 2000                                                                  Page 3

became an issue. He appeared impulsive. He started doing tasks before I completed instructions, and many of his error were of he impulsive kind. There were no indications of exaggeration or malingering. He did better on easier and worse on harder items. and he did well on many individual tests. This pattern performance contraindicates likelihood of any attempts to intentionally appear disabled. Mr. Lorefice also scored in the normal (non-malingered ) range on the Rey 15-Item Test, which is specifically designed to detect exaggeration.

Mr. Lorefice's overall test performance shows no indications of difficulty with attention. concentration, motor, visuo-spatial, receptive speech, or memory functions. Mr. Lorefice did show a very distinct pattern of mild to moderate prefrontal involvement. This was demonstrated by selective impairment on every one of the tests that I administered that are specifically sensitive to deficient functioning of the prefrontal lobes of the brain. These include the COWA. RFFT, Part B of the TMT, and the color-word interference portion of the Stroop. Specific test performance was as follows:

<u>Attention & concentration</u>. Test performance shows appropriate attention, concentration, and mental effort devoted to testing. Mr. Lorefice scored between the 59th and 75th percentiles (50th percentile is average) on the Digit Span test, which is a measure of attention and sustained concentration. He scored at the 59th percentile in the Mental Control subtest of the WMS-III, which measures sustained concentration.

<u>Sensorimotor Functions:</u> Mr. Lorefice demonstrated adequate motor praxis (ability to make meaningful movements to demonstration and verbal command), finger naming, kinesthesis, right-left discrimination, ability to perform rapid fine motor movements, and ability to perform competing motor sequences.

<u>Visual Functions</u>. Mr. Lorefice did well on various tasks requiring adequacy of visual search, reproduction of visual material, and memory for visually presented stimuli. These include Trails-A and visual memory portions of the WMS. There were no indications of visual interference or problems with visuo-motor abilities on the Bender B–I-P.

<u>Receptive Speech</u>. This area of functioning was not formally tested. However, Mr. Lorefice. displayed appropriate understanding of words, phrases, and complex grammatical relationships. He showed no difficulty understanding complex test instructions.

<u>Expressive Speech</u>. Mr. Lorefice showed no evidence of dysarthria, dysprosidy, paraphasia, or word finding difficulties. His conversational speech was fluent with appropriate use of content and relational words. He did show difficulties in verbal fluency. On the Controlled Oral Word Association Test, Mr. Lorefice scored at the 50th percentile on categorical associates (naming's many animals as he could in 60 seconds). However, he scored in the severely impaired range (5th percentile) when asked to come up with all he words he could think of in 60 seconds that started with the same letter.

Peter Fink, M.D.    . Re: <u>S. Lorefice</u>
August 1, 2000    Page 4

    <u>Memory</u>. Mr. Lorefice scored in the normal range on tests of immediate visual and verbal memory. He performed in the superior range on tests of delayed verbal and visual memory. There were no indications of confabulation, excessive simplification, or unusual intrusions.

    <u>Mental flexibility</u>. Mr. Lorefice did very poorly on tests of mental flexibility. He produced more perseverations on the Ruff Figural Fluency Test than 98% of the normal population (scoring at the 2nd percentile). He did much worse on Part B of the Trailmaking Test (25th percentile) than on Part A (83rd percentile.) Part A requires visual scanning and sequential thinking. Part B also requires Mr. Lorefice to constantly switch problem-solving strategies. Mr. Lorefice showed the same problem on the color word interference portion of the Stroop, which required him to constantly inhibit what comes most naturally. On this portion of the Stroop, Mr. Lorefice scored in the severely impaired range.

    <u>Higher Cognitive Processes</u>. Mr. Lorefice scored at the 90th percentile on the Vocabulary subtest of the Shipley, while scoring at the 37th percentile on the Abstract Reasoning subtest of the Shipley. This indicates general verbal intelligence in the average range for his age, and this is consistent with his educational background. However, the discrepancy between better vocabulary and poorer problem-solving scores suggests the possibility of a reduction in intellectual functioning from previous levels, especially for complex tasks.

## B. Psychological Testing

*2. Minnesota Multiphasic Personality Inventory-2.*

    The validity scale elevations and configurations of the MMPI-2 show that Mr. Lorefice answered items with some consistently, and with substantial attempts to present himself in a socially desirable manner. He did not inordinately minimize emotional symptoms, but he denied even the most basic human faults or limitations. This style of minimization often reflects a naïve, unsophisticated, and uninsightful stance toward psychological issues or personal problems. Malingering or exaggeration of psychological problems is specifically contraindicated. However, validity scale scores suggest that there may be difficulties which Mr. Lorefice is not admitting to on psychological testing.

    The primary scale profile shows two scores in the diagnostic range, on measures of depression and emotional repression. This is usually indicative of significant depression as is seen in people who have grown accustomed to chronic problems and who continue to operate at a reduced level of efficiency. The likelihood of depression is further indicated by indications of reduced energy, enthusiasm, and activity levels. Physical complaints are likely, but tend to display a hysterical quality and to increase under stress. Mr. Lorefice may feel moderately anxious or apprehensive. Under stress, he is likely to have physical complaints, but he represses any conscious acknowledgment that he may have psychological problems. Mr. Lorefice denied any undue

Peter Fink, M.D.
August 1, 2000

Re: <u>S. Lorefice</u>
Page 5

suspiciousness, persecutory ideation, over-sensitivity to slights, hostility, social isolation or alienation, disorganization of thought processes, undue impulsivity, emotional lability, or vulnerability to substance abuse.

Mr. Lorefice appears to have very little insight or capacity for self reflection. He has very limited resources available for coping with stress. The profile is indicative of people with passive, inner-directed, and aesthetic interests. Such people do not identify with traditional or stereotypic masculine interests. Such individuals, may have difficulties in decisiveness or excessive dependency or passivity. There are no indications on primary scales, special scales, or subscales of any authority conflicts, antisocial tendencies, cynicism toward others, or overt hostility. If anything, Mr. Lorefice tends to overly repress any semblance of anger. His profile is also generally reflective of individuals who may customarily maintain control over their aggressive feelings through a rigid defense system, in which they deny angry impulses and suppress all expression of aggression. There are no indications of characterological vulnerability to alcohol or substance abuse. At the present time, Mr. Lorefice feels moderately depressed, slowed down, and physically uncomfortable. He appears to be moderately introverted or withdrawn, and acknowledged substantial social avoidance. Such people are uncomfortable with others people and have problems being assertive.

*3. Millon Clinical Multiaxial Inventory-III.*

This person's response style suggests a moderate tendency toward self-deprecation and a consequent over-dramatization of current emotional problems. However, adjustments were automatically made to reduce the influence of this tendency on clinical scales. Resultant clinical scale scores of the MCMI-III show severe anxiety, depression, and somatization, along with an alcohol abuse disorder. Mr. Lorefice shows many of the characteristics of patients with major depressive disorders. The personality profile shows marked schizoid and dependent traits, with avoidant, depressive, and self-defeating features. The overall profile is consistent with presence of a severe mental disorder.

The MCMI-III profile of this man suggests that he is unusually dependent, self-effacing, and noncompetitive. He leans on others for guidance and security, assuming a passive role in most relationships. A striking lack of initiative and a general avoidance of autonomy are notable. He is likely to be dependent and vulnerable if separated from those who provide support. He may resent those on whom he depends if they are critical or disapproving. However, his security is threatened if he expresses his resentment, so that anger is expressed infrequently. He is fearful of rebuff, and may withdraw from social relationships. He feels depressed, lonely, and isolated, even though he may be unlikely to admit these distressing moods. Such people tend to feel less important or capable than others. They are easily lead by others and relate to them in a submissive and dependent manner. They also shy away from challenges or competitive situations. They tend to act in a humble and congenial manner. Such people assume that if they do not make mistakes, they can depend on other people to provide their needs.

Peter Fink, M.D.
August 1, 2000

This man may attempt to appear calm, but underlying tensions and emotional dysphoria are present in a disturbing mixture of anxiety, sadness, insecurity, and guilt. This man's reported complaints of weakness and fatigability and his tendency to succumb easily to physical exhaustion and illness are likely to represent a somatic expression of his underlying mood of depression. He may experience life as empty but draining, and he may constantly feel weary or apathetic. By restricting his social contacts and emotional involvement, he may effectively limit the possibility of learning new, potentially useful skills and competencies.

The clinical picture is consistent with presence of major depression. This person is likely to be preoccupied with matters of personal adequacy. He is especially sensitive to public humiliation and rejection. He has grown tolerant of daily unhappiness and emptiness. Fearful of expressing his discontent to others who might thereby reject or humiliate him, he deals with his frustration by turning it inward, becoming intropunitively depressed. Clinical scores also suggest presence of a prominent anxiety disorder. He is experiencing widely generalized symptoms that are consistent with his overall personality makeup of being socially uncomfortable, edgy, apprehensive over small matters, worried, self-doubting, and unconfident. Specific psychosomatic signs may be present in addition to the more general anxious state

Test data indicate that recurrent periods of alcoholism have been a major problem for this troubled man. He may find alcohol to be a useful lubricant that reduces tensions, stirs fantasies of enhanced esteem, and permits the quick dissolution of emotional pain. By disconnecting his preoccupation over social rejection and isolation, alcohol serves to undo his sense of alienation, to bolster his self-confidence, and to provide a respite from the anguish and frustration that characterize much of his life.

*Therapeutic Considerations:* As a first step, it would appear advisable to implement methods to ameliorate this person's current state of clinical anxiety and depression by implementation of supportive psychotherapeutic measures. The possibility of psychiatric medications may also be considered. This amiable and dependent person is inclined to lean on others for support. It is likely that this person's difficulties can be managed with either brief or extended therapeutic methods. First, he should receive specific treatment for alcohol abuse disorder. Behavioral management or group therapy programs should be considered. Once this person's more pressing or acute difficulties are adequately stabilized, attention should be directed toward goals that would aid in preventing a recurrence of problems, together with identification, and resolution of underlying psychological issues. Circumscribed treatment efforts are best directed toward countering the dependency attitudes and behaviors of this self-effacing man. Active short-term techniques should take advantage of introducing environmental changes to maximize growth, to minimize continued dependency, and to provide uplifting experiences. The relationship between therapist and client can be explored to overcome the dominance-submission patterns that may have characterized this person's recent history. Both nondirective and directive cognitive approaches are likely to foster the growth of autonomy and self-confidence. Group therapy may be pursued fruitfully as a means of learning autonomous skills and as an aid to the growth of social confidence.

Peter Fink, M.D.
August 1, 2000

*4. Sixteen Personality Factors Questionnaire.*

Validity scale scores of the 16PF indicate that Mr. Lorefice tended to describe himself in extremes, at times minimizing and at other times overdramatizing various psychological problems. On this instrument, Mr. Lorefice described himself as extremely extroverted, outgoing, good-natured, warm-hearted, trustful, and attentive to people. Isolation from others may be particularly stressful to such people, and this personality pattern is often suggestive of impulsivity or emotional lability. He prefers to depend on his own resources and judgments rather than seeking the advise or direction of others. Mr. Lorefice's scores are associated with social restraint, sensitivity to threat, and emotional cautiousness. This pattern often suggests presence of depression. Mr. Lorefice further described himself as submissive, obedient, and dependent. Such individuals may have passive-dependent problems and may serve as "doormats' to others, even to the point of being the scapegoat in pathological family situations. He is highly subjective and emotionally sensitive, to the extent that his emotions may strongly affect his judgements. He may have difficulty exercising objective, dispassionate decision-making when personal factors are involved. He tends to have a naïve, unassuming view of others. He sees himself as sophisticated, clever, and socially poised, but is likely to be emotionally unattached or unspontaneous, and uninsightful of himself and others.

*5. Rorschach Psychodiagnostic Test.*

Mr. Lorefice produced an average number of responses on the Rorschach (20) which demonstrates an ability to use his imagination, and contraindicates any substantial defensiveness on this instrument. This number of responses was sufficient for scoring and analysis according to the empirically derived Exner Comprehensive System.

The Rorschach protocol indicates shows adequate reality contact with no indications of obsessive or paranoid interpretive styles, and no evidence of thought disorder. This person appears to have fewer resources available than most people for coping with the ordinary ideational and emotional demands of everyday living. He is maintaining a seemingly stable psychological equilibrium by a determined effort to disturbing thoughts and feelings out of his conscious awareness. He may consequently give the appearance of being able to manage the stresses in his life, and he may appear relatively free from overt anxiety, tension, nervousness, and irritability. Persons of this type typically lead restricted lives in which they avoid new and challenging situations and limit themselves as much as possible to undemanding activities undertaken in familiar surroundings and in the company of people who know them well and can be expected to accept them as they are. As long as they are successful in limiting the level of everyday stress they have to confront, such people tend to be satisfied with their lives and to see little need to change themselves or their circumstances. When such "hunkered down" individuals are confronted with increased obstacles or setbacks, they are at risk for episodes of subjectively felt distress, limited frustration tolerance, and poor impulse control.

Peter Fink, M.D.                                                       Re: <u>S. Lorefice</u>
August 1, 2000                                                                Page 8

At times, Mr. Lorefice may not think things out logically. He takes in more information than he can organize efficiently. But in general, he is capable of interpreting events in a conventional and appropriate manner. This person tends to view the world with an overly narrow frame of reference. As a consequence, he is likely to have little tolerance for uncertainty and ambiguity. He feels most comfortable in clearly defined and well-structured situations, and he favors simple solutions to even complex problems. Although he is capable of forming accurate impressions of his experience, he often opts for unconventional ways of perceiving people and events. This person appears to lack a consistent and well-defined coping style. He is likely to alternate ineffectively between using his head and his heart, which may lend a quality of unpredictability to his behavior and decisions.

Mr. Lorefice does not appear to be as introspective as most people. Because of his lack of self-awareness, he is at risk for adjustment difficulties involving inadequate understanding of himself, insufficient appreciation of the impact he has on other people, and limited capacity to examine himself in a critical fashion and then to modify his behavior accordingly. He shows less psychological complexity than most people. He seeks simple solutions to life's problems. This person also tends to focus on himself more than most people do. This degree of self-centeredness is usually associated with highly positive estimates of one's personal worth. In this instance, however, it is likely that his inordinate preoccupation with himself is more a source of dissatisfaction than of enjoyment.

This person shows less interest in others than most people, but is able to relate to others on an emotional level. He expects that people will ordinarily interact in a spirit of cooperation, and therefore, he anticipates collaborative relationships with others and participates in them willingly. He appears more strongly committed than most people to being agreeable and establishing harmonious relationships. Such individuals typically behave positive and cooperative ways. Even if they are usually self-centered or interpersonally withdrawn, they are likely to be popular and well-liked members of the social groups to which they belong. However, Mr. Lorefice tends to feel uncomfortable in social situations and sometimes misperceives or misinterprets interpersonal events, leading to misjudgments about other poeple.

## SUMMARY and CONCLUSIONS

Mr. Lorefice was cooperative with two days of interview and testing. He appeared fully oriented, and showed adequate attention and concentration. He expended adequate effort on testing, although he tended to be impulsive when listening to instructions and carrying out tasks. Mr. Lorefice has a history of severe alcohol abuse. He drank up to a quart of hard liquor per day, had numerous falls and blackouts, and suffered withdrawal symptoms. He also abused marijuana, and suffered from anxiety and depression, for which he received medication. He took Valium, and mixed medications with intoxicants. He may have sustained head injuries without remembering them, which is common among alcoholics with his history and symptoms.

Peter Fink, M.D.
August 1, 2000

On neuropsychological testing, Mr. Lorefice displayed average overall intelligence with very good verbal skills and no indications of attentional, motor, visuo-spatial, or memory dysfunction. However, he appeared impulsive throughout interview and testing, and showed a dramatic, classic, and severe pattern of prefrontal lobe involvement. This was indicated by consistently poor performance on a variety of tests that are all specifically sensitive to prefrontal brain deficits, but are otherwise unrelated. There are no indications of exaggeration or malingering, and the specificity of Mr. Lorefice's test performance on a variety of different tests argue strongly against any intentional attempt to create an impression of disability.

The frontal lobes of the brain constitute the organ for acting on one's environment. The prefrontal lobes are responsible for what are called "executive" functions. These include initiation of behavior, selection of goals and sub-goals, direction of behavior, determining success and failure, inhibiting inappropriate actions, deciding when a course of behavior is completed, and anticipating the consequences of one's own behavior. Frontal and prefrontal lobes are particularly sensitive to impairment resulting form alcohol abuse. Mr. Lorefice's condition is unusual, in that he does not show the memory or problems typical of chronic alcoholics. However, he does show a very specific prefrontal syndrome, possibly aggravated by his history of mixed substance abuse and possible head injuries. Individuals with prefrontal deficits can show a variety of deficits, but have greatest problems with complex judgement, inhibiting inappropriate actions, and shifting direction when a particular course of behavior is no longer working. The duration of Mr. Lorefice's prefrontal deficits cannot be retrospectively assessed through testing. However, the severity of his tested deficits this long after he has been abstinent suggests that he has had significant prefrontal deficits for at least several years. This means that severe alcohol abuse not only created brain deficits, but Mr. Lorefice's continued alcohol and other substance abuse also most likely aggravated his organically-based problems in judgement and capacity to engage in appropriate actions.

Psychological testing supports Mr. Lorefice's self-report in showing presence of a long-standing depression and anxiety disorder, with both positive and negative symptoms. There is also evidence of somatization, which is common among alcoholics. To the extent that Mr. Lorefice was depressed in the past, the combination of emotional distress, brain dysfunction, and continued intoxication, could not help but feed on each other in impairing his judgement, reasoning, and behavioral control. Personality testing shows Mr. Lorefice to be a highly dependent person who is very submissive in interpersonal relationships and is highly susceptible to manipulation by other people. He extent of his dependency needs is sufficient to cause him substantial problems in understanding himself and relating to other people. By definition, his personality disorder is long-standing. The combination of excessive dependency and depression has also engendered self-defeating, personalty traits, which may lead to problematic decisions and interpersonal involvements. There are no indications on testing of any sociopathy, hostility, egomania, indifference, manipulativeness, cynicism, or any qualities to suggest that Mr. Lorefice may have been predisposed to criminal or antisocial behavior.

Peter Fink, M.D.
August 1, 2000

Re: <u>S. Lorefice</u>
Page 10

## DIAGNOSTIC IMPRESSIONS

| | | |
|---|---|---|
| Axis I: | Major Depression | 296.33 |
| | Recurrent, severe, without psychotic features. | |
| | Generalized Anxiety Disorder | 300.02 |
| | Alcohol Abuse | 305.00 |
| | in Current Remission, Severe | |
| | Cannabis Abuse, in Remission | 305.20 |
| | Alcohol-Related Disorder NOS | 291.9 |
| | Substance-induced prefrontal syndrome. | |
| Axis II: | Dependent Personality Disorder | 301.6 |
| | With Avoidant personality traits | |

Please feel free to contact me for any additional assistance or information you may require in this regard.

Sincerely,

Orest E. Wasyliw, Ph.D.
Licensed Clinical Psychologist
Director of Adult Clinical Psychology

**UNITED STATES DISTRICT COURT**    **JUDGE GRADY**
**NORTHERN DISTRICT OF ILLINOIS**

**EASTERN DIVISION**

**01C 1243**

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff-Respondant, | ) | Case No. 01 C ___ |
| | ) | |
| v. | ) | Case No. 97 CR 415 |
| | ) | |
| Salvatore Lorefice, | ) | |
| | ) | Hon. John F. Grady |
| | ) | |
| Defendant-Movant. | ) | |

**DOCKETED**

FEB 2 6 2001

**MEMORANDUM OF LAW IN SUPPORT OF MOTION
PURSUANT TO 28 U.S.C. § 2255 TO VACATE SENTENCE**

The Defendant, Salvatore Lorefice, by his attorneys, James Thompson, Esquire, of

Winston and Strawn and Alan Ellis, Esquire, of the Law Offices of Alan Ellis, has moved this

Court pursuant to 28 U.S.C. § 2255 to vacate his sentence imposed on August 26, 1998, and

entered August 31, 1998. Mr. Lorefice was deprived of due process at sentencing, because the

facts were not as presented to this Court. Rather, the record presented to this Court provided a

materially inaccurate picture of the defendant. In particular, since the sentencing hearing, it has

come to light that Mr. Lorefice suffers from mental dysfunction and alcoholism. This

information was not contained in the presentence report nor presented to this Court. Moreover,

this information would have had a material effect on the sentence imposed. Accordingly, after a

hearing, this Court should grant the relief requested.

## I. PROCEDURAL AND FACTUAL BACKGROUND

On June 12, 1997, a grand jury sitting in the Northern District of Illinois returned a

seven-count indictment charging Salvatore Lorefice and a co-defendant with four counts of mail

fraud (Counts One, Four, Five, and Seven), in violation of 18 U.S.C. § 1341, and three counts of

wire fraud, in violation of 18 U.S.C. § 1343 (Counts Two, Three and Six). On January 20, 1998, following a nine-day trial before John F. Grady, U.S.D.J., and a jury, Mr. Lorefice was convicted on all counts. Mr. Lorefice did not testify.

On August 26, 1998, this Court sentenced Mr. Lorefice to 57 months' imprisonment, followed by three years' supervised release, a $50,000 fine, $700 special assessments, and $600,000 in restitution. The 57 month sentence constituted the top end of the guideline range found applicable. At sentencing, the Court made the following statement:

> I have no doubt that the defendant will use every means he can to avoid any effort to collect the judgment. And because I have that attitude, I would disqualify myself from any hearing that might take place on the collection efforts such as we were discussing earlier today on the question of fraudulent conveyances and so on. I am totally convinced that the defendant is a basically dishonest person who has been guilty of an egregious fraud and will continue in that fraudulent conduct in an effort to frustrate whatever efforts the government makes to collect the restitution and the fine.
>
> And having that attitude, I think it would be inappropriate for me to preside over any factual or any proceedings designed to collect the judgment that I am going to enter. And I tell you that in advance, so that there will be no surprises. Should the thing be referred to me or assigned to me, if it's filed, what I'll do is recuse myself. (Emphasis added).

Sent. Tr. 32-33.

Mr. Lorefice filed a timely notice of appeal, and on September 16, 1999, the Seventh Circuit affirmed the judgment of conviction and sentence in an opinion reported at 192 F.3d 647 (7th Cir. 1999). On October 25, 1999, the Court of Appeals denied Mr. Lorefice's timely petition for rehearing and rehearing in banc. Mr. Lorefice petitioned the Supreme Court for a writ of certiorari, which was denied on February 28, 2000. 2000 WL 122161. Mr. Lorefice, therefore, filed a timely motion pursuant to 28 U.S.C. § 2255 to vacate his conviction and sentence.

The Seventh Circuit summarized the evidence which supports Mr. Lorefice's conviction as follows:

Lorefice and his wife Bonnie owned a travel agency called Corporate Travel Consultants Corporation ("CTC"); Lorefice served as CTC's Chairman of the Board. Noordin Lakhani was the accounting director, Chief Financial Officer, and insurance expert for the company; he reported to Lorefice. From December of 1990, continuing through at least June 1994, Lorefice and Lakhani hatched and carried out a scheme to defraud five different insurance companies: Metropolitan Life Insurance Company ("Metlife"), Mutual Benefit Life Insurance Company ("Mutual"), Royal Maccabees Life Insurance Company ("Royal"), Hartford Life and Accident Insurance Company ("Hartford"), and Benefit Trust Insurance Company ("Trustmark"). The plot involved the purchase of group life insurance policies for persons allegedly employed by CTC. This kind of policy was attractive because group policies usually do not require individual medical examinations as a prerequisite for coverage. The insurance companies instead protected themselves in other ways: to be covered, the person had to be a current, full-time employee, and the policies prohibited "stacking," or the purchase of several policies on the same risk leading to a cumulative level of coverage in excess of that which a single company would underwrite without medical examinations or other, more rigorous scrutiny.

The key to the system Lorefice and Lakhani devised was to find individuals who were critically ill and thus likely to die soon, to list them as employees of CTC, and (unbeknownst to the "insured" individual) to designate Lorefice, his daughters, or in one case Lakhani as the beneficiary of the policy. Certain arrangements were necessary to accomplish this. First, Lorefice and Lakhani submitted a false census of employees (i.e. a list of all full-time employees, with names, titles, and dates of birth) to each insurer. In some instances, people included in the census were not CTC employees at all; in other instances, they were bona fide employees, but they did not know that the policies existed. For example, Lorefice made himself the beneficiary on multiple policies for Rosina Lorefice, his mother, age 95; Anna Orofino, his godmother, who was 89; and Joe Lorefice, his brother. None was a current CTC employee. Lorefice also made himself the beneficiary on policies for CTC employees Mabel Barsema, Joel Timmel, and Steve Young, and he made his daughters the beneficiaries on policies for CTC employee Jeffrey Metcalf. None of the "insureds" knew about the coverage. Barsema was over 70 years old and had recently suffered a stroke and a heart attack, while Timmel, Young, and Metcalf were HIV positive. Lakhani was the beneficiary on a policy for his father Akbarali Lakhani, who was not an employee of CTC and who was in poor health. Second, Lorefice and Lakhani took steps to make sure that each insurance company was unaware of the existence of the others.

Two of the individuals covered by these policies (Rosina Lorefice and Jeffrey Metcalf) died before the scheme was discovered. Following their

3

deaths, Lorefice collected $600,000 in death benefits, from Metlife, Mutual, Royal, and Hartford. The plot unwound, however, before anyone else died.

192 F.3d at 649-50.

## II. STATEMENT OF FACTS

Salvatore Lorefice is a severely mentally ill 65-year-old man with a Dependent Personality Disorder with Avoidant Personality Traits who suffers from Major Depression and Generalized Anxiety Disorder. Until his imprisonment, Mr. Lorefice also suffered from severe alcohol abuse, which led to dysfunction in the frontal lobe of his brain. These serious psychiatric conditions went undiagnosed and untreated until this year, when Mr. Lorefice was evaluated at the request of present counsel by Dr. Peter M. Fink, a Board-Certified and Forensic Psychiatrist of the Isaac Ray Institute in Chicago.

Prior to trial, two of Mr. Lorefice's attorneys, Stephen Komie and Patrick Tuite, attempted to negotiate plea agreements for him. However, Mr. Lorefice was unable to appreciate the wrongfulness of his conduct and refused to plead guilty. Mr. Lorefice argued with counsel frequently, often fixating on small and irrelevant details. Mr. Lorefice seemed unable to appreciate the realities of his situation.

After the trial, Mr. Lorefice's attorney, Michael Monico, Esq., as well as sentencing counsel, James R. Thompson, Esq., Mark L. Rotert, Esq., and Michael B. Johnson, Esq., did not have Mr. Lorefice evaluated by a mental health professional. Counsel also did not inquire of Mr. Lorefice whether he had a drug or alcohol abuse problem. Although Mr. Lorefice is an alcoholic who has abused alcohol for many years, he did not reveal his alcoholism to the Probation Officer conducting the presentence investigation, because Mr. Lorefice feared that revealing his alcoholism would result in less favorable treatment. As a result, the PSI did not report this problem. Because the PSI failed to document Mr. Lorefice's alcohol abuse, the Bureau of

Prisons ("BOP") has refused to allow Mr. Lorefice to participate in its 500-hour residential drug program. Were Mr. Lorefice to be accepted in the BOP's drug program, he would be eligible for up to a year's reduction in his term of imprisonment once he completed the program, as provided by 18 U.S.C. § 3621(e)(2)(B).

The presentence report does not present an accurate picture of Mr. Lorefice, and such a picture was not otherwise presented to the sentencing court. Since the time of sentencing, Mr. Lorefice has been evaluated by a psychiatrist. Counsel now has learned that Mr. Lorefice suffers from significantly reduced mental capacity that contributed to the commission of his offense. In addition, Mr. Lorefice's reduced mental capacity was aggravated by his chronic alcoholism.

The reports prepared by Dr. Fink, a psychiatrist, and the report of Dr. Orest Eugene Wasyliw, a licensed clinical psychologist, provide an accurate picture of Mr. Lorefice and are attached as Exhibit A. Dr. Fink has concluded that "Mr. Lorefice most likely abused and depended upon alcohol to treat his chronic and untreated Major Depression and Generalized Anxiety Disorder." Report at 5. Dr. Fink also concluded that at the time of his offense, Mr. Lorefice suffered from diminished mental capacity which contributed to the commission of his offense:

> At the time Mr. Lorefice reportedly engaged in the behaviors that resulted in his conviction, he suffered from reduced mental capacity. His reduced mental capacity resulted from his under lying Major Depression and Generalized Anxiety Disorders, his Alcohol Abuse and Dependence Disorders, his personality traits and features, and his frontal lobe dysfunction.

Report at 3. Dr. Fink noted that "significantly reduced mental capacity" means the defendant . . . has a significantly impaired ability to (A) understand the wrongfulness

of the behavior comprising the offense or to exercise the power of reason; or (B) control behavior that the defendant knows is wrongful. Dr. Fink opined:

> Mr. Lorefice's use of alcohol was reportedly initially voluntary in his youth (twenties and thirties). However, at the time of the offense, Mr. Lorefice suffered from extreme emotional need, emotional disorders and cognitive impairments. Consequently, Mr. Lorefice would have failed to appreciate the long-term consequences of his actions. Mr. Lorefice's protestations of innocence in this matter at the time of trial stems from his failure to appreciate the wrongfulness of his acts due to his illness-based inability to appreciate the long-term consequences of his actions.

Id.

In addition, Dr. Fink noted that Mr. Lorefice demonstrated "defects of reasoning, including faulty memory and confabulated recollections." Report at 4. Dr. Fink identified numerous instances in which Mr. Lorefice exhibited defective reasoning, which Fink opined to be present at the time of the offense. Id. Dr. Fink explained that Mr. Lorefice's defective reasoning was characterized by his fixation on irrelevant detail that had "idiosyncratic meaning" to him, which in turn resulted in irrational reasoning. These problems

> were more likely than not present and made worse at the time of the offense by Mr. Lorefice's severe alcohol dependence. Mr. Lorefice's defective reasoning allowed him to view as rational his participation in and/or condoning of signature forgery for dying employees and family members. Mr. Lorefice most likely demonstrated no forethought that these actions were inherently wrong.

Id.

None of these problems were identified before trial or sentencing. As a result, the presentence investigation report contains no information about Mr. Lorefice's mental condition or his alcoholism. More significant, this Court imposed sentence based on an inaccurate and incomplete picture of the defendant.

## III. ARGUMENT

**SALVATORE LOREFICE WAS DEPRIVED OF HIS FIFTH AMENDMENT RIGHT TO DUE PROCESS, BECAUSE HE WAS SENTENCED BASED ON A MATERIALLY INACCURATE PICTURE OF HIS CHARACTER AND MENTAL STATE IN COMMITTING THE OFFENSE CONDUCT. THIS DEPRIVATION REQUIRES RESENTENCING.**

Salvatore Lorefice's sentence must be vacated, because this Court, as well as counsel for both parties, was operating under a material misapprehension of fact at the time of sentencing. See United States v. Tucker, 404 U.S. 443, 447 (1972); Townsend v. Burke, 334 U.S. 736 (1948); United States ex rel. Welch v. Lane, 738 F.2d 863, 864-65 (7th Cir. 1984). This Court was not informed that Mr. Lorefice suffered from significantly diminished mental capacity and chronic alcoholism, which contributed to the commission of the offense. Mr. Lorefice's reduced mental capacity both provided a defense to the charges _and_ significantly reduced his culpability for the offense.[1] Thus, his reduced mental capacity, as well as his chronic alcoholism, were quite relevant to sentencing.

### A. Evidence of Mr. Lorefice's Diminished Mental Capacity and Alcoholism Was Material to Sentencing.

Since the time of trial and sentencing, counsel have learned that Mr. Lorefice suffers from a significantly diminished mental capacity which contributed to his commission of the

---

[1]     Mail and wire fraud are specific intent crimes. See United States v. Paneras, 222 F.3d 406, 410 (7th Cir. 2000) (an "intent to defraud" means that the defendant "acted willfully and with the specific intent to deceive or cheat, usually with the purpose of getting financial gain to [himself] or causing financial loss to another." (quoting United States v. Moede, 48 F.3d 238, 241 (7th Cir. 1995). Evidence of diminished capacity is admissible in prosecutions for specific intent offenses to show that a defendant lacks the intent required for conviction. United States v. Ricketts, 146 F.3d 492, 497 (7th Cir. 1998); United States v. Reese, 991 F.2d 399, 400 (7th Cir. 1993). Such evidence may be presented through expert testimony bearing on the question whether the defendant possessed the requisite _mens rea_ to commit the charged offense. United States v. Childress, 58 F.3d 693, 728 (D.C. Cir. 1995); United States v. Pohlot, 827 F.2d 889, 906 (3d Cir. 1987) and see generally, United States v. Fazzini, 871 F.2d 635, 741 (7th Cir. 1989) (discussing admissibility of evidence of mental illness, but concluding that such evidence is inadmissible in prosecution for general intent crime).

charged offenses. Mr. Lorefice's reduced mental capacity was highly relevant to sentencing, yet the sentencing court was not provided with correct information regarding this matter.

A defendant has a due process right to be sentenced based upon materially accurate information. Tucker, 404 U.S. at 446-47; Theodorou v. United States, 887 F.2d 1336, 1339 (7th Cir. 1989). The Seventh Circuit has recognized that in imposing sentence, a sentencing judge properly relies, at least in part, on the impression that he has developed of the defendant's personality over the course of proceedings. United States v. Anaya, 32 F.3d 308, 312 (7th Cir. 1994). When the facts presented at sentencing are incomplete, however, then the judge's impression is likely to be inaccurate as well. United States v. Barnes, 907 F.2d 693, 695-96 (7th Cir. 1990); see also, Welch v. Lane, 738 F.2d at 865 (judge's impression of defendant erroneous because believed defendant had been previously convicted of armed robbery rather than robbery). While inaccurate information alone does not require resentencing, where the information is material to the sentence choice, resentencing is required.[2]

The evidence now available to this Court shows that Mr. Lorefice is a chronic alcoholic who suffered from, among other things, major depression, generalized anxiety disorders, and frontal lobe dysfunction. Report at 2-3. His frontal lobe dysfunction was aggravated by continuing alcohol abuse. Id. Mr. Lorefice exhibited defective reasoning, likely caused by the impairments mentioned above. Further, his cognitive impairments were additionally exacerbated by his extreme emotional need and alcohol abuse. Dr. Fink concluded that the confluence of these problems significantly reduced Mr. Lorefice's mental capacity. Exh. A. at 2-4.

---

[2]     The standard for determining whether reliance on inaccurate information is low: a petitioner need only show it is "not improbable" that the sentencing court was influenced by improper factors. United States v. Barnes, 907 F.2d at 696 (quoting Rizzo v. United States, 821 F.2d 1271, 1274 (7th Cir. 1987) quoting United States v. Harris, 558 F.2d 366, 375 (7th Cir. 1977)).

Had counsel been aware of Mr. Lorefice's mental condition, counsel would have brought the matter to this Court's attention and requested a downward departure pursuant to U.S.S.G. §5K2.13. U.S.S.G. §5K2.13 permits district courts to depart downward when the defendant committed the offense while suffering from a significantly reduced mental capacity. The extent of the departure is to reflect the extent to which the reduced mental capacity contributed to the commission of the offense. Application note 1 of the commentary to U.S.S.G. § 5K2.13 defines "significantly reduced mental capacity" as:

> the defendant, although convicted, has a significantly impaired ability to

>> (A) understand the wrongfulness of the behavior comprising the offense or to exercise the power of reason; or

>> (B) control behavior that the defendant knows is wrongful.

The significantly reduced mental capacity must have contributed to the commission of the offense, but the reduced capacity need not be a "but for" cause of the criminal conduct. United States v. Dyer, 216 F.3d 568, 570-71 (7th Cir. 2000). Rather, a downward departure for diminished capacity requires only some causal connection between the defendant's reduced mental capacity and his commission of the offense. Id.; United States v. Leandre , 132 F.3d 796, 803-04 (D.C. Cir. 1998).

Here, the complete lack of information regarding Mr. Lorefice's diminished mental capacity and his alcoholism resulted in the imposition of a sentence that was fundamentally unfair. This Court imposed a sentence at the high end of the guideline range, based in part on the severe negative impression that this Court garnered of Mr. Lorefice throughout the proceedings. However, this Court (and counsel) was unaware that, at the time of the offense conduct, Mr. Lorefice suffered from major depression, generalized anxiety disorders, and had some frontal lobe dysfunction. This Court also was unaware that all of these ailments were exacerbated by

9

Mr. Lorefice's alcohol abuse which was a product of his mental illness.[3] Finally, this Court was not informed that Mr. Lorefice's mental ailments significantly reduced his ability to understand the wrongfulness of the behavior comprising the offense and his ability to exercise the power of reason. Had this Court possessed the information now available, it is likely this Court would have had a more accurate view and formed a different impression of Mr. Lorefice's character: as that of a man who was sick and behaved impulsively, rather than one who was simply a cold and calculating criminal.

Had this Court been aware that Mr. Lorefice was in fact ill, rather than simply dishonest, this Court might well have imposed a lesser sentence. This Court might have departed downward from the applicable guideline range based on diminished mental capacity. Even if the evidence was viewed by this Court as insufficient for a downward departure, the evidence might well have influenced this Court as to the sentence to be imposed within the guideline range. The absence of mitigating evidence is significant because this Court imposed a sentence at the high end of the guideline range. This Court also expressed considerable chagrin at Mr. Lorefice's actions, going so far as to disqualify itself from involvement in any efforts to collect the restitution imposed. This Court's statements at sentencing reflected a strong negative impression of the defendant's character, which might have been altered by evidence of Mr. Lorefice's diminished mental capacity and alcoholism.

The omission of the evidence regarding Mr. Lorefice's mental dysfunction and alcoholism from the presentence report also has harmed him with regard to his treatment by the Bureau of Prisons. Because Mr. Lorefice did not reveal his alcoholism to the Probation Officer

---

[3]     The fact that Mr. Lorefice abused alcohol, which exacerbated his mental ailments, did not make a downward departure unavailable. United States v. Cantu, 12 F.3d 1506, 1514 (9th Cir. 1993); United

10

and there is no information in the PSI regarding his disease, the BOP has refused to allow him to

participate in the Residential Drug and Alcohol Treatment Program (RDAP)[4]. Had the BOP

permitted Mr. Lorefice to participate in RDAP, and were he to complete the program, he would

be eligible for up to a one year reduction in his sentence, because Mr. Lorefice meets the other

requirement of § 3621(e)-(2)(B), viz., he has been "convicted of a nonviolent offense.

## CONCLUSION

WHEREFORE, for the foregoing reasons, this Court should vacate the defendant's

sentence and resentence him.

Dated: February 23, 2001

Respectfully submitted,

SALVATORE LOREFICE

Local Counsel:

WINSTON & STRAWN

By:_____
    JAMES THOMPSON
    35 West Wacker Drive
    Chicago, IL  60601
    (312) 558-5600

LAW OFFICE OF ALAN ELLIS

By:_____
    ALAN ELLIS
    34 Issaquah Dock
    Sausalito, CA 94965
    (415) 332-6464

Attorneys for the Defendant-Movant

---

States v. Herbert, 902 F.Supp. 827, 830 n.2 (N.D.Ill. 1995).  Thus, the fact that Mr. Lorefice was a
practicing alcoholic at the time of the offense conduct did not render him ineligible for a departure.

[4]Dr. Fink notes on page 6 of his report: "Mr. Lorefice did not provide truthful information to the investigating
officer who prepared the PSI.  The motives for this behavior are unclear.  However, lack of insight, shame, and
embarrassment likely placed a substantial role in his silence about his mental state."

# EXHIBIT   A



**FILE**

**RECD OCT 23 2000**

# ISAAC RAY CENTER, INC.

1725 West Harrison Street, Suite 110
Chicago, Illinois 60612
(312) 829-8021
Facsimile: (312) 829-1476

James L. Cavanaugh, Jr., M.D.
*Chairman of the Board*
*President*

Consultants in Behavioral Risk Management

Peter M. Fink, M.D.
Vice President
Fee for Services Operations and
Child & Adolescent Forensic Services

Medical Director, Special Projects

October 16, 2000

Mr. Allan Ellis
Attorney at Law
34 Issaquah Dock
Waldo Point Harbor
Sausalito, California 94965

Re:    Mr. Salvatore Lorefice
       DOB: 12/02/34
       Reg. No.: 11292-424

Dear Mr. Ellis:

After having received Dr. Wasyliw's 8/01/00 psychological testing report, I am providing the following update to my 7/20/00 preliminary report. As before the interviews conducted (see "Sources of Information") and records reviewed (see "Sources of Information"), form the basis for my opinions. All opinions provided are to a reasonable degree of medical psychiatric certainty. As this is a preliminary report, if additional interviews, records, test results, or testimony become available, then my opinions and/or recommendations may change.



Salvatore Lorefice Report
October 16, 2000
Page 2 of 6

## OPINIONS:

- Mr. Lorefice suffers from mental disorders.

- Mr. Lorefice is not malingering or grossly exaggerating any mental disorder or deficits.

- Mr. Lorefice suffers from the following major psychiatric disorders:[1]

  - Major Depression Recurrent, Severe, Without Psychotic Features.

  - Generalized Anxiety Disorder.

  - Alcohol Abuse and Dependence in Current Remission, Severe.

  - Alcohol-Related Disorder Not Otherwise Specified with Substance-Induced Prefrontal Syndrome.

  - Marijuana Abuse in Remission.

- In addition, Mr. Lorefice suffers from the following personality traits and features.[2]

  - Dependent Personality Disorder with Avoidant Personality Traits.

- Mr. Lorefice does not demonstrate a pattern of psychological test findings commonly associated with individuals predisposed to antisocial or criminal behavior.

- Neuropsychological assessment reveals a distinct pattern of frontal lobe dysfunction with variable concentration but without significant memory impairment.

- In addition to being the cause of his frontal lobe dysfunction, Mr. Lorefice's alcohol abuse and dependence would have aggravated the consequences of his frontal lobe dysfunction, namely

---

[1] Major psychiatric disorders include major depression, manic-depressive or bipolar disorder, schizophrenia, and organic brain syndromes.

[2] According to the **Diagnostic and Statistical Manual, 4th Edition** (DSM-IV), American Psychiatric Association, Washington, D.C., 1994: *"Personality traits* are enduring patterns of perceiving, relating to, and thinking about the environment and oneself that are exhibited in a wide range of social and personal contexts. Only when *personality traits* are *inflexible* and *maladaptive* and *cause significant functional impairment* or *subjective distress* do they constitute Personality Disorders.

The essential feature of a Personality Disorder is an enduring pattern of inner experience and behavior that deviates markedly from the expectations of the individual's culture and is manifested in at least two of the following areas: cognition, affectivity, interpersonal functioning, or impulse control (Criterion A). This enduring pattern is inflexible and pervasive across a broad range of personal and social situations (Criterion B) and leads to clinically significant distress or impairment in social, occupational, or other important areas of functioning (Criterion C). The pattern is stable and of long duration, and its onset can be traced back at least to adolescence or early adulthood (Criterion D). The pattern is not better accounted for as a manifestation or consequence of another mental disorder (Criterion E) and is not due to the direct physiological effects of a substance (e.g., a drug of abuse, a medication, exposure to a toxin) or a general medical condition (e.g., head trauma) (Criterion F)...

The diagnosis of Personality Disorders requires an evaluation of the individual's long-term patterns of functioning, and the particular personality features must be evident by early adulthood. The personality traits that define these disorders must also be distinguished from characteristics that emerge in response to specific situational stressors or more transient mental states (e.g., Mood or Anxiety Disorders, Substance Intoxication). The clinician should assess the stability of personality traits over time and across different situations. Although a single interview with the person is sometimes sufficient for making the diagnosis, it is often necessary to conduct more than one interview and to space these over time. Assessment can also be complicated by the fact that the characteristics that define a Personality Disorder may not be considered problematic by the individual (i.e., the traits are often ego-syntonic). To help overcome this difficulty, supplementary information from other informants may be helpful."

preservation[3], impulsive behaivor, and cognitive inflexibility.[4] It is likely that the alcohol caused his brain dysfunction leaving permanent residua that we measured during our evaluation. However, his continued heavy drinking also aggravated his cognitive problems. In fact, the current measured problems in judgement and flexibility would have been worse during his years of alcohol use than they are now.

- At the time Mr. Lorefice reportedly engaged in the behaviors that resulted in his conviction, he suffered from reduced mental capacity. His reduced mental capacity resulted from his underlying Major Depression and Generalized Anxiety Disorders, his Alcohol Abuse and Dependence Disorders, his personality traits and features, and his frontal lobe dysfunction.

- Federal Guidelines that define diminished capacity require that the defendant suffer from a significantly reduced mental capacity. The guidelines clarify the policy statement regarding significantly reduced mental capacity in the following terms.

  > ""*Significantly reduced mental capacity" means the defendant, although convicted, has a significantly impaired ability to (A) understand the wrongfulness of the behavior comprising the offense or to exercise the power of reason; or (B) control behavior that the defendant knows is wrongful.*"[5]

The above guidelines apply to Mr. Lorefice in the following way. Mr. Lorefice's use of alcohol was reportedly initially voluntary in his youth (twenties and thirties). However, at the time of the offense Mr. Lorefice suffered from multiple problems. At the time of the offense, Mr. Lorefice suffered from extreme emotional need, emotional disorders, and cognitive impairment. Consequently, Mr. Lorefice would have failed to appreciate the long-term consequences of his actions. Mr. Lorefice's protestations of innocence in this matter at the time of his trial stems from his failure to appreciate the wrongfulness of his acts due to his illness-based inability to appreciate the long-term consequences of his actions.

During our evaluation, Mr. Lorefice demonstrated defective reasoning. The type of defective reasoning demonstrated at out evaluation we believe was present at the time of the offense. Although the examples that follow do not demonstrate a reasoning defect as part of a criminal act, they demonstrate how Mr. Lorefice's defective reasoning works. We observed that Mr. Lorefice repeatedly picked on irrelevant detail that had idiosyncratic meaning to him. He then magnified the importance or relative weight of the detail, and reasoned irrational forward from that point.

- When we entered the prison grounds to begin our evaluation, Mr. Lorefice focused on the location of the physical space used for the interview. Initially, he wanted to use a certain area of the prison for the evaluation. Within steps of the entrance, Mr. Lorefice engaged in verbal argument with prison staff when they rejected his suggestion. The argument became protracted and eventually required the prison staff and us to dissuade and disengage him.

---

[3] Perseveration is the tendency to emit the same verbal, motor, or other behavioral response repeatedly to varied stimuli that should by their varied nature should result in varied responses appropriate to the stimuli.
[4] Cognitive inflexibility refers to the inability to shift concept when the situation and data dictate a change of perspective.
[5] **Federal Guidelines Manual,** November 1, 1998, §5K2.13, page 363.

- When finally situated in a comfortable and reasonable evaluation space, Mr. Lorefice repeatedly objected to the reasonable monitoring of the evaluation process by prison personnel, citing unreasoned and inappropriate intrusion into the evaluation space. However, the prison guards or officials were courteous, respectful of our privacy, and unobtrusive. Mr. Lorefice continued to complain despite our reassurance that we did not object.

- On the first day of the evaluation, Mr. Lorefice had offered us a recommendation of a place to eat. When told the next day that the evaluators had chosen another dining site, Mr. Lorefice repeatedly brought up the issue as if he had suffered a personal affront despite repeated reassurance that the examiners had done what they had wanted.

- When we questioned Mr. Lorefice about the pre-sentencing evaluation, Mr. Lorefice indignantly denied that he had done anything improper in terms of providing travel favors for local politicians. Mr. Lorefice launched himself into an outraged diatribe against the US Attorney and his staff. Mr. Lorefice appeared genuinely affronted that the US Attorney had questioned his integrity on the matter in question or that he had behaved improperly in any manner. As part of his digressive diatribe, Mr. Lorefice spoke about how he would speak to his attorneys about what he considered defamatory statements by the pre-sentencing evaluator that he had not known about before our evaluation.

- Furthermore, Mr. Lorefice insisted that he had not consumed alcohol at the time of his Federal criminal trial. However, according to his current attorney, Mr. Lorefice consumed alcohol during his trial. Mr. Lorefice indignantly denied any such assertion and insisted that any other version of the facts as stated by him constituted slanderous untruths.

Defects of reasoning, including faulty memory and confabulated recollections, demonstrated during the evaluation where more likely than not present and made worse at the time of the offense by Mr. Lorefice's severe alcohol dependence. Mr. Lorefice's defective reasoning allowed him to view as rational his participation in and/or condoning of signature forgery for dying employees and family members. Mr. Lorefice most likely demonstrated no forethought that these actions were inherently wrong. Instead, Mr. Lorefice acted with us as if he believed that his actions were his rightful benefit. Mr. Lorefice believed himself entitled, on the advice of his accountant, to the benefit because he (in fact it was his wife's company) had paid large premiums to the companies. Consequently, Mr. Lorefice believed that he had the right, having paid the appropriate fee, to benefit from the impending death of family members and individuals company employees.

Mr. Lorefice's outraged and indignant responses to us about his contacts with local politicians and his use of alcohol during his trial years after the events were remarkable. His statements during our evaluation radically differed from the information others provided. Furthermore, Mr. Lorefice rejected a plea agreement that would have allowed him to avoid jail time from his offense based on his illogical belief and against the advice of his attorneys that he was innocent. Instead, Mr. Lorefice reasoned illogically, that he

was innocent, truly unaware that his reasoning was wrong. Mr. Lorefice's maintained posture that he reportedly believed as the truth, most likely best served his self-image. In addition, his outrage at statements he viewed as impugning his character may represent faulty or confabulated memory occurring during a time of alcohol dependence.

- The pattern of our findings is consistent with an individual suffering from underlying major psychiatric disorders who uses alcohol to treat his symptoms.

- At the time of our evaluation, Mr. Lorefice experienced psychiatric symptoms sufficient to require active treatment with psychotropic medication and counseling.

- Mr. Lorefice most likely abused and depended upon alcohol to treat his chronic and untreated Major Depression and Generalized Anxiety Disorder. Without active and ongoing treatment now, Mr. Lorefice's current level of depression and anxiety symptoms substantially increases his risk of alcohol relapse.

- Mr. Lorefice's alcohol abuse and alcohol dependence caused brain damage amplified his inherent lack of insight about his condition impairing his capacity to help himself. His lack of insight about his psychiatric disorders and brain dysfunction was apparent during the evaluation.

- While Mr. Lorefice appears affable, outgoing, and personable he is in fact extremely anxious, has multiple somatic concerns, and prefers social avoidance as he finds extended interpersonal contact overwhelming. He is an emotionally sensitive, shy, and usually timid man. He is more passive than active in interpersonal relationships. Mr. Lorefice's personality is such that he is not the kind of person who when exposed to an intoxicant (alcohol) will develop addiction due to minimal exposure. His personality does not make him prone to physical addiction. Consequently, his alcohol abuse resulted from his major psychiatric disorder(s).

- Mr. Lorefice is extremely dependent on others who he views as authoritative and directive. Given his passivity and gullibility despite a superficial appearance of sophistication and authority, he is highly vulnerable to the manipulative machinations of others.

- Mr. Lorefice did not provide truthful information to the investigating officer who prepared the PSI. The motives for this behavior are unclear. However, lack of insight, shame, and embarrassment likely placed a substantial role in his silence about his mental state.

- If Mr. Lorefice had undergone a competent comprehensive psychiatric and neuropsychological evaluation before the PSI investigation, then the PSI would likely have reported different findings more in line with the current assessment.

## RECOMMENDATIONS:

1. Mr. Lorefice requires the services of a psychiatrist to provide psychotropic drug treatment for his major psychiatric disorders.

2. Mr. Lorefice requires placement in an intensive, alcohol rehabilitation program for additional treatment and education due to his very high risk of alcohol relapse. Mr. Lorefice's risk of relapse derives from the complex of psychiatric, neuropsychological, and personality features that we have come to understand drive his drinking behavior.

Salvatore Lorefice Report
October 16, 2000
Page 6 of 6

## SOURCES OF INFORMATION:

**Interviews Conducted:**

- 05/15/00, Interview of Ms. Bonnie Lorefice by Peter M. Fink, M.D. at the Isaac Ray Center for 0.5 hours.

- 6/08/00, Telephone Interview of Robert Adams, LCSW, by Peter M. Fink, M.D. at the Isaac Ray Center for 0.5 hours.

- 6/9/00, Telephone Interview of Frank Nadell, by Peter M. Fink, M.D. at the Isaac Ray Center for 0.5 hours.

- 6/11/00, Telephone Interview of Rev. Teri Nadell, by Peter M. Fink, M.D. at the Isaac Ray Center for 0.5 hours.

- 6/28/00, Interview of Mr. Lorefice, by Peter M. Fink, M.D. at the Federal Prison Camp, Terre Haute, Indiana for 2.5 hours.

- 6/29/00, Interview of Mr. Lorefice, by Peter M. Fink, M.D. at the Federal Prison Camp, Terre Haute, Indiana for 1.0 hours.

**Records Reviewed:**

- 6/08/98, Pre-Sentence Investigation (PSI) Report, Docket #97 CR 415-1.

- 9/16/99, US Court of Appeals for the Seventh Circuit Decision, 192 F.3d 647; 1999 U.S. App. Lexis 22457.

- 4/11/00, Letter to Honorable Judy Biggert for Margaret C. Hambrick, Regional Director, Federal Bureau of Prisons.

- 5/12/00, Letter to Honorable Judy Biggert for Margaret C. Hambrick, Regional Director, Federal Bureau of Prisons.

- 4/13/00, Administrative Remedy Regional Appeal, Part B- Response, Remedy ID No. 208150-R1, date filed 4/12/00.

- 6/00, Letter to Peter M. Fink, M.D. from, Dr. Hanna, Plastic Surgeon.

**Psychological Testing Administered:**

- 8/01/00, Psychological Test Report of the 6/28 and 6/29/00, Psychological Evaluation of Mr. Lorefice by Orest Wasyliw, Ph.D.

**Additional Information:**

- 6/12/00, Letter from Peter M. Fink, M.D. to Mr. Alan Ellis, Concerning Preliminary Findings Based on Work to Date.

If you have any questions, then please contact me at 312/829-8021.

Sincerely,

Peter M. Fink, M.D.
Board-Certified Psychiatrist, Child Psychiatrist, and Forensic Psychiatrist

**FILE**

REC'D AUG 14 2000



# ISAAC RAY CENTER, INC.

1720 West Polk Street
Chicago, Illinois 60612
(312) 942-4462
Facsimile: (312) 942-2224
After Hours Answering Service: (312) 829-8021

Consultants in Behavioral Risk Management

James L. Cavanaugh, Jr., M.D.
*Chairman of the Board*
*President*

Orest Eugene Wasyliw, Ph.D.
*Director*
*Adult Clinical Psychology*

August 1, 2000

Peter Fink, M.D.
Isaac Ray Center, Inc.
1720 West Polk Street
Chicago, Illinois 60612

Re: S. Lorefice

Dear Dr. Fink,

I performed a psychological evaluation of Mr. Salvitore Lorefice for the purpose of assessing the presence, nature, and extent of any psychopathology which may relate to the actions for which he has been convicted. This evaluation was performed on June 28 and 29, 2000, at the Federal Prison Farm at Terre Haute, Indiana, and consisted of a clinical interview plus the administration of the following psychometric instruments:

*Shipley Institute of Living Scale*
*Wechsler Adult Intelligence Scale-III*
*Russell 1975/88 Revision of the Wechsler Memory Scale*
*Infromation/Orientation, Mental Control, and Digit Span subtests of the*
 *Wechsler Memory Scale-III*
*Motor Functions Scale of the Luria-Nebraska Neuropsychological Battery*
*Controlled Oral Word Association Test*
*Ruff Figural Fluency Test*
*Stroop Color-Word Interference Test*
*Trailmaking Test*
*Bender-Gestalt Test, Background Interference Procedure*
*Rey Dissimulation Test*
*Individual tasks of Visual and Receptive Speech functioning*
*Minnesota Multiphasic Personality Inventory-2*
*Millon Clinical Multiaxial Inventory-II*

Peter Fink, M.D.
August 1, 2000

Re: <u>S. Lorefice</u>
Page 2

*Sixteen Personality Factors Questionnaire*
*Rorschach Psychodiagnostic Test*

## OBSERVATIONS and INTERVIEW

Mr. Lorefice was courteous and cooperative throughout testing, and appeared oriented in all regards. He was very sociable and easily engaged in spontaneous conversation. If anything, he seemed exceedingly anxious to please. There were no indications of unusual preoccupations or inappropriate logic. However, Mr. Lorefice's responses were often fragmented with tangential intrusions suggestive of anxiety. Otherwise, his affect showed a normal range and was appropriate to the testing situation, with no evidence of undue depression, suspiciousness, resentment, or fatigue. Mr. Lorefice understood and accepted my initial warnings as to the boundaries of confidentiality for this evaluation. Test instructions and items were easily understood, and test-taking conditions were judged as adequate for the administration of the above psychological instruments.

Since we both participated in interviewing Mr. Lorefice, I will not repeat the interview information he gave us in this report. Significant aspects of Mr. Lorefice's reported history include the following: Mr. Lorefice is a sixty-four year old, married, right-handed white male who has 12 years of education. Mr. Lorefice reported a history of excessive alcohol use spanning over thirty years. Mr. Lorefice has also had long-standing problems with anxiety and depression that have caused or contributed to his alcohol abuse. His drinking worsened in the late 1980's and early 1990's, when he suffered the death within the same month of his mother, brother, and sister. He drank socially but did not usually drink to excess until about the age of 45. Thereafter, he reportedly drank half a fifth to a quart of hard liquor per day. He suffered numerous blackouts, pass outs, and falls, at times striking his head. He also suffered withdrawal symptoms after he quit. He consulted a plastic surgeon in 1988 because his eyes had become so puffy that he had trouble keeping them open. His doctor told him that the puffy periorbital skin most likely resulted from excessive alcohol use. Mr. Lorefice also reported several DUIs. An older brother died from the consequences of chronic and severe alcohol abuse. Mr. Lorefice abused marijuana in the 1990's. He stopped in 1995 after repeated paranoid reactions to marijuana. This constituted a change from the previously relaxing effect of this drug. Mr. Lorefice took Valium since the 1980's to treat his anxiety and alcohol withdrawal symptoms. Mr. Lorefice had a heart attack in the late 1970's and spent several weeks recuperating in the hospital.

# Psychological Test Findings

## A. Neuropsychological Assessment.

Mr. Lorefice devoted adequate attention and effort to testing. He appeared highly motivated on tests that were easy or looked familiar to him, but gave up quickly when difficulty or effort

Peter Fink, M.D.                                                    Re: <u>S. Lorefice</u>
August 1, 2000                                                              Page 3

became an issue. He appeared impulsive. He started doing tasks before I completed instructions, and many of his error were of he impulsive kind. There were no indications of exaggeration or malingering. He did better on easier and worse on harder items, and he did well on many individual tests. This pattern performance contraindicates likelihood of any attempts to intentionally appear disabled. Mr. Lorefice also scored in the normal (non-malingered ) range on the Rey 15-Item Test, which is specifically designed to detect exaggeration.

Mr. Lorefice's overall test performance shows no indications of difficulty with attention, concentration, motor, visuo-spatial, receptive speech, or memory functions. Mr. Lorefice did show a very distinct pattern of mild to moderate prefrontal involvement. This was demonstrated by selective impairment on every one of the tests that I administered that are specifically sensitive to deficient functioning of the prefrontal lobes of the brain. These include the COWA, RFFT, Part B of the TMT, and the color-word interference portion of the Stroop. Specific test performance was as follows:

<u>Attention & concentration</u>. Test performance shows appropriate attention, concentration, and mental effort devoted to testing. Mr. Lorefice scored between the 59th and 75th percentiles (50th percentile is average) on the Digit Span test, which is a measure of attention and sustained concentration. He scored at the 59th percentile in the Mental Control subtest of the WMS-III, which measures sustained concentration.

<u>Sensorimotor Functions:</u> Mr. Lorefice demonstrated adequate motor praxis (ability to make meaningful movements to demonstration and verbal command), finger naming, kinesthesis, right-left discrimination, ability to perform rapid fine motor movements, and ability to perform competing motor sequences.

<u>Visual Functions</u>. Mr. Lorefice did well on various tasks requiring adequacy of visual search, reproduction of visual material, and memory for visually presented stimuli. These include Trails-A and visual memory portions of the WMS. There were no indications of visual interference or problems with visuo-motor abilities on the Bender B–I–P.

<u>Receptive Speech</u>. This area of functioning was not formally tested. However, Mr. Lorefice displayed appropriate understanding of words, phrases, and complex grammatical relationships. He showed no difficulty understanding complex test instructions.

<u>Expressive Speech</u>. Mr. Lorefice showed no evidence of dysarthria, dysprosidy, paraphasia, or word finding difficulties. His conversational speech was fluent with appropriate use of content and relational words. He did show difficulties in verbal fluency. On the Controlled Oral Word Association Test, Mr. Lorefice scored at the 50th percentile on categorical associates (naming s many animals as he could in 60 seconds). However, he scored in the severely impaired range (5th percentile) when asked to come up with all he words he could think of in 60 seconds that started with the same letter.

Peter Fink, M.D.                                                    . Re: S. Lorefice
August 1, 2000                                                          Page 4

    <u>Memory</u>.  Mr. Lorefice scored in the normal range on tests of immediate visual and verbal memory. He performed in the superior range on tests of delayed verbal and visual memory. There were no indications of confabulation, excessive simplification, or unusual intrusions.

    <u>Mental flexibility</u>. Mr. Lorefice did very poorly on tests of mental flexibility. He produced more perseverations on the Ruff Figural Fluency Test than 98% of the normal population (scoring at the 2nd percentile). He did much worse on Part B of the Trailmaking Test (25th percentile) than on Part A (83rd percentile.) Part A requires visual scanning and sequential thinking. Part B also requires Mr. Lorefice to constantly switch problem-solving strategies. Mr. Lorefice showed the same problem on the color word interference portion of the Stroop, which required him to constantly inhibit what comes most naturally. On this portion of the Stroop, Mr. Lorefice scored in the severely impaired range.

    <u>Higher Cognitive Processes</u>. Mr. Lorefice scored at the 90th percentile on the Vocabulary subtest of the Shipley, while scoring at the 37th percentile on the Abstract Reasoning subtest of the Shipley. This indicates general verbal intelligence in the average range for his age, and this is consistent with his educational background. However, the discrepancy between better vocabulary and poorer problem-solving scores suggests the possibility of a reduction in intellectual functioning from previous levels, especially for complex tasks.

## B. Psychological Testing

*2. Minnesota Multiphasic Personality Inventory-2.*

    The validity scale elevations and configurations of the MMPI-2 show that Mr. Lorefice answered items with some consistently, and with substantial attempts to present himself in a socially desirable manner. He did not inordinately minimize emotional symptoms, but he denied even the most basic human faults or limitations. This style of minimization often reflects a naïve, unsophisticated, and uninsightful stance toward psychological issues or personal problems. Malingering or exaggeration of psychological problems is specifically contraindicated. However, validity scale scores suggest that there may be difficulties which Mr. Lorefice is not admitting to on psychological testing.

    The primary scale profile shows two scores in the diagnostic range, on measures of depression and emotional repression. This is usually indicative of significant depression as is seen in people who have grown accustomed to chronic problems and who continue to operate at a reduced level of efficiency. The likelihood of depression is further indicated by indications of reduced energy, enthusiasm, and activity levels. Physical complaints are likely, but tend to display a hysterical quality and to increase under stress. Mr. Lorefice may feel moderately anxious or apprehensive. Under stress, he is likely to have physical complaints, but he represses any conscious acknowledgment that he may have psychological problems. Mr. Lorefice denied any undue

Peter Fink, M.D.                                                  Re: <u>S. Lorefice</u>
August 1, 2000                                                          Page 5

suspiciousness, persecutory ideation, over-sensitivity to slights, hostility, social isolation or alienation, disorganization of thought processes, undue impulsivity, emotional lability, or vulnerability to substance abuse.

Mr. Lorefice appears to have very little insight or capacity for self reflection. He has very limited resources available for coping with stress. The profile is indicative of people with passive, inner-directed, and aesthetic interests. Such people do not identify with traditional or stereotypic masculine interests. Such individuals, may have difficulties in decisiveness or excessive dependency or passivity. There are no indications on primary scales, special scales, or subscales of any authority conflicts, antisocial tendencies, cynicism toward others, or overt hostility. If anything, Mr. Lorefice tends to overly repress any semblance of anger. His profile is also generally reflective of individuals who may customarily maintain control over their aggressive feelings through a rigid defense system, in which they deny angry impulses and suppress all expression of aggression. There are no indications of characterological vulnerability to alcohol or substance abuse. At the present time, Mr. Lorefice feels moderately depressed, slowed down, and physically uncomfortable. He appears to be moderately introverted or withdrawn, and acknowledged substantial social avoidance. Such people are uncomfortable with others people and have problems being assertive.

*3. Millon Clinical Multiaxial Inventory-III.*

This person's response style suggests a moderate tendency toward self-deprecation and a consequent over-dramatization of current emotional problems. However, adjustments were automatically made to reduce the influence of this tendency on clinical scales. Resultant clinical scale scores of the MCMI-III show severe anxiety, depression, and somatization, along with an alcohol abuse disorder. Mr. Lorefice shows many of the characteristics of patients with major depressive disorders. The personality profile shows marked schizoid and dependent traits, with avoidant, depressive, and self-defeating features. The overall profile is consistent with presence of a severe mental disorder.

The MCMI-III profile of this man suggests that he is unusually dependent, self-effacing, and noncompetitive. He leans on others for guidance and security, assuming a passive role in most relationships. A striking lack of initiative and a general avoidance of autonomy are notable. He is likely to be dependent and vulnerable if separated from those who provide support. He may resent those on whom he depends if they are critical or disapproving. However, his security is threatened if he expresses his resentment, so that anger is expressed infrequently. He is fearful of rebuff, and may withdraw from social relationships. He feels depressed, lonely, and isolated, even though he may be unlikely to admit these distressing moods. Such people tend to feel less important or capable than others. They are easily lead by others and relate to them in a submissive and dependent manner. They also shy away from challenges or competitive situations. They tend to act in a humble and congenial manner. Such people assume that if they do not make mistakes, they can depend on other people to provide their needs.

Peter Fink, M.D.
August 1, 2000

Re: <u>S. Lorefice</u>
Page 6

This man may attempt to appear calm, but underlying tensions and emotional dysphoria are present in a disturbing mixture of anxiety, sadness, insecurity, and guilt. This man's reported complaints of weakness and fatigability and his tendency to succumb easily to physical exhaustion and illness are likely to represent a somatic expression of his underlying mood of depression. He may experience life as empty but draining, and he may constantly feel weary or apathetic. By restricting his social contacts and emotional involvement, he may effectively limit the possibility of learning new, potentially useful skills and competencies.

The clinical picture is consistent with presence of major depression. This person is likely to be preoccupied with matters of personal adequacy. He is especially sensitive to public humiliation and rejection. He has grown tolerant of daily unhappiness and emptiness. Fearful of expressing his discontent to others who might thereby reject or humiliate him, he deals with his frustration by turning it inward, becoming intropunitively depressed. Clinical scores also suggest presence of a prominent anxiety disorder. He is experiencing widely generalized symptoms that are consistent with his overall personality makeup of being socially uncomfortable, edgy, apprehensive over small matters, worried, self-doubting, and unconfident. Specific psychosomatic signs may be present in addition to the more general anxious state

Test data indicate that recurrent periods of alcoholism have been a major problem for this troubled man. He may find alcohol to be a useful lubricant that reduces tensions, stirs fantasies of enhanced esteem, and permits the quick dissolution of emotional pain. By disconnecting his preoccupation over social rejection and isolation, alcohol serves to undo his sense of alienation, to bolster his self-confidence, and to provide a respite from the anguish and frustration that characterize much of his life.

*Therapeutic Considerations:* As a first step, it would appear advisable to implement methods to ameliorate this person's current state of clinical anxiety and depression by implementation of supportive psychotherapeutic measures. The possibility of psychiatric medications may also be considered. This amiable and dependent person is inclined to lean on others for support. It is likely that this person's difficulties can be managed with either brief or extended therapeutic methods. First, he should receive specific treatment for alcohol abuse disorder. Behavioral management or group therapy programs should be considered. Once this person's more pressing or acute difficulties are adequately stabilized, attention should be directed toward goals that would aid in preventing a recurrence of problems, together with identification, and resolution of underlying psychological issues. Circumscribed treatment efforts are best directed toward countering the dependency attitudes and behaviors of this self-effacing man. Active short-term techniques should take advantage of introducing environmental changes to maximize growth, to minimize continued dependency, and to provide uplifting experiences. The relationship between therapist and client can be explored to overcome the dominance-submission patterns that may have characterized this person's recent history. Both nondirective and directive cognitive approaches are likely to foster the growth of autonomy and self-confidence. Group therapy may be pursued fruitfully as a means of learning autonomous skills and as an aid to the growth of social confidence.

Peter Fink, M.D.
August 1, 2000

*4. Sixteen Personality Factors Questionnaire.*

Validity scale scores of the 16PF indicate that Mr. Lorefice tended to describe himself in extremes, at times minimizing and at other times overdramatizing various psychological problems. On this instrument, Mr. Lorefice described himself as extremely extroverted, outgoing, good-natured, warm-hearted, trustful, and attentive to people. Isolation from others may be particularly stressful to such people, and this personality pattern is often suggestive of impulsivity or emotional lability. He prefers to depend on his own resources and judgments rather than seeking the advise or direction of others. Mr. Lorefice's scores are associated with social restraint, sensitivity to threat, and emotional cautiousness. This pattern often suggests presence of depression. Mr. Lorefice further described himself as submissive, obedient, and dependent. Such individuals may have passive-dependent problems and may serve as "doormats" to others, even to the point of being the scapegoat in pathological family situations. He is highly subjective and emotionally sensitive, to the extent that his emotions may strongly affect his judgements. He may have difficulty exercising objective, dispassionate decision-making when personal factors are involved. He tends to have a naïve, unassuming view of others. He sees himself as sophisticated, clever, and socially poised, but is likely to be emotionally unattached or unspontaneous, and uninsightful of himself and others.

*5. Rorschach Psychodiagnostic Test.*

Mr. Lorefice produced an average number of responses on the Rorschach (20) which demonstrates an ability to use his imagination, and contraindicates any substantial defensiveness on this instrument. This number of responses was sufficient for scoring and analysis according to the empirically derived Exner Comprehensive System.

The Rorschach protocol indicates shows adequate reality contact with no indications of obsessive or paranoid interpretive styles, and no evidence of thought disorder. This person appears to have fewer resources available than most people for coping with the ordinary ideational and emotional demands of everyday living. He is maintaining a seemingly stable psychological equilibrium by a determined effort to disturbing thoughts and feelings out of his conscious awareness. He may consequently give the appearance of being able to manage the stresses in his life, and he may appear relatively free from overt anxiety, tension, nervousness, and irritability. Persons of this type typically lead restricted lives in which they avoid new and challenging situations and limit themselves as much as possible to undemanding activities undertaken in familiar surroundings and in the company of people who know them well and can be expected to accept them as they are. As long as they are successful in limiting the level of everyday stress they have to confront, such people tend to be satisfied with their lives and to see little need to change themselves or their circumstances. When such "hunkered down" individuals are confronted with increased obstacles or setbacks, they are at risk for episodes of subjectively felt distress, limited frustration tolerance, and poor impulse control.

Peter Fink, M.D.
August 1, 2000

Re: S. Lorefice
Page 8

At times, Mr. Lorefice may not think things out logically. He takes in more information than he can organize efficiently. But in general, he is capable of interpreting events in a conventional and appropriate manner. This person tends to view the world with an overly narrow frame of reference. As a consequence, he is likely to have little tolerance for uncertainty and ambiguity. He feels most comfortable in clearly defined and well-structured situations, and he favors simple solutions to even complex problems. Although he is capable of forming accurate impressions of his experience, he often opts for unconventional ways of perceiving people and events. This person appears to lack a consistent and well-defined coping style. He is likely to alternate ineffectively between using his head and his heart, which may lend a quality of unpredictability to his behavior and decisions.

Mr. Lorefice does not appear to be as introspective as most people. Because of his lack of self-awareness, he is at risk for adjustment difficulties involving inadequate understanding of himself, insufficient appreciation of the impact he has on other people, and limited capacity to examine himself in a critical fashion and then to modify his behavior accordingly. He shows less psychological complexity than most people. He seeks simple solutions to life's problems. This person also tends to focus on himself more than most people do. This degree of self-centeredness is usually associated with highly positive estimates of one's personal worth. In this instance, however, it is likely that his inordinate preoccupation with himself is more a source of dissatisfaction than of enjoyment.

This person shows less interest in others than most people, but is able to relate to others on an emotional level. He expects that people will ordinarily interact in a spirit of cooperation, and therefore, he anticipates collaborative relationships with others and participates in them willingly. He appears more strongly committed than most people to being agreeable and establishing harmonious relationships. Such individuals typically behave positive and cooperative ways. Even if they are usually self-centered or interpersonally withdrawn, they are likely to be popular and well-liked members of the social groups to which they belong. However, Mr. Lorefice tends to feel uncomfortable in social situations and sometimes misperceives or misinterprets interpersonal events, leading to misjudgments about other poeple.

## SUMMARY and CONCLUSIONS

Mr. Lorefice was cooperative with two days of interview and testing. He appeared fully oriented, and showed adequate attention and concentration. He expended adequate effort on testing, although he tended to be impulsive when listening to instructions and carrying out tasks. Mr. Lorefice has a history of severe alcohol abuse. He drank up to a quart of hard liquor per day, had numerous falls and blackouts, and suffered withdrawal symptoms. He also abused marijuana, and suffered from anxiety and depression, for which he received medication. He took Valium, and mixed medications with intoxicants. He may have sustained head injuries without remembering them, which is common among alcoholics with his history and symptoms.

Peter Fink, M.D.
August 1, 2000

On neuropsychological testing, Mr. Lorefice displayed average overall intelligence with very good verbal skills and no indications of attentional, motor, visuo-spatial, or memory dysfunction. However, he appeared impulsive throughout interview and testing, and showed a dramatic, classic, and severe pattern of prefrontal lobe involvement. This was indicated by consistently poor performance on a variety of tests that are all specifically sensitive to prefrontal brain deficits, but are otherwise unrelated. There are no indications of exaggeration or malingering, and the specificity of Mr. Lorefice's test performance on a variety of different tests argue strongly against any intentional attempt to create an impression of disability.

The frontal lobes of the brain constitute the organ for acting on one's environment. The prefrontal lobes are responsible for what are called "executive" functions. These include initiation of behavior, selection of goals and sub-goals, direction of behavior, determining success and failure, inhibiting inappropriate actions, deciding when a course of behavior is completed, and anticipating the consequences of one's own behavior. Frontal and prefrontal lobes are particularly sensitive to impairment resulting form alcohol abuse. Mr. Lorefice's condition is unusual, in that he does not show the memory or problems typical of chronic alcoholics. However, he does show a very specific prefrontal syndrome, possibly aggravated by his history of mixed substance abuse and possible head injuries. Individuals with prefrontal deficits can show a variety of deficits, but have greatest problems with complex judgement, inhibiting inappropriate actions, and shifting direction when a particular course of behavior is no longer working. The duration of Mr. Lorefice's prefrontal deficits cannot be retrospectively assessed through testing. However, the severity of his tested deficits this long after he has been abstinent suggests that he has had significant prefrontal deficits for at least several years. This means that severe alcohol abuse not only created brain deficits, but Mr. Lorefice's continued alcohol and other substance abuse also most likely aggravated his organically-based problems in judgement and capacity to engage in appropriate actions.

Psychological testing supports Mr. Lorefice's self-report in showing presence of a long-standing depression and anxiety disorder, with both positive and negative symptoms. There is also evidence of somatization, which is common among alcoholics. To the extent that Mr. Lorefice was depressed in the past, the combination of emotional distress, brain dysfunction, and continued intoxication, could not help but feed on each other in impairing his judgement, reasoning, and behavioral control. Personality testing shows Mr. Lorefice to be a highly dependent person who is very submissive in interpersonal relationships and is highly susceptible to manipulation by other people. He extent of his dependency needs is sufficient to cause him substantial problems in understanding himself and relating to other people. By definition, his personality disorder is long-standing. The combination of excessive dependency and depression has also engendered self-defeating, personalty traits, which may lead to problematic decisions and interpersonal involvements. There are no indications on testing of any sociopathy, hostility, egomania, indifference, manipulativeness, cynicism, or any qualities to suggest that Mr. Lorefice may have been predisposed to criminal or antisocial behavior.

  
Peter Fink, M.D.
August 1, 2000

Re: <u>S. Lorefice</u>
Page 10

## DIAGNOSTIC IMPRESSIONS

Axis I:   Major Depression . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 296.33
          Recurrent, severe, without psychotic features.

          Generalized Anxiety Disorder . . . . . . . . . . . . . . . . . . . . . . . . . . . 300.02

          Alcohol Abuse . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 305.00
          in Current Remission, Severe

          Cannabis Abuse, in Remission . . . . . . . . . . . . . . . . . . . . . . . . . . . 305.20

          Alcohol-Related Disorder NOS . . . . . . . . . . . . . . . . . . . . . . . . . . . 291.9
          Substance-induced prefrontal syndrome.

Axis II:  Dependent Personality Disorder . . . . . . . . . . . . . . . . . . . . . . . . . 301.6
          With Avoidant personality traits

    Please feel free to contact me for any additional assistance or information you may require in this regard.

Sincerely,

Orest E. Wasyliw, Ph.D.
Licensed Clinical Psychologist
Director of Adult Clinical Psychology

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS

JUDGE GRADY



# Civil Cover Shee 01C 1243

This automated JS-44 conforms generally to the manual JS-44 approved by the Judicial Conference of the United States in September 1974. The data is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. The information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law. This form is authorized for use <u>only</u> in the Northern District of Illinois.

| | |
|---|---|
| **Plaintiff(s): United States of America** | **Defendant(s): Salvatore Lorefice** |
| County of Residence: | County of Residence: Vigo County, Indiana |
| Plaintiff's Atty: Kathleen T. Murdock<br>Office of the United States<br>Attorney<br>219 S. Dearborn Street, 5th<br>Floor Chicago, IL 60603<br>312-353-1598 | Defendant's Atty: Alan Ellis<br>Law Offices of Alan Ellis<br>34 Issaquah Dock Sausalito,<br>CA 94965<br>(415) 332-6464 |

II. Basis of Jurisdiction: 1 U.S. Gov't ~~Plaintiff~~ *Defendant*

III. Citizenship of Principle Parties (Diversity Cases Only)

Plaintiff:- N/A

Defendant:- N/A

IV. Origin : **1. Original Proceeding**

V. Nature of Suit: **510 Motions to Vacate Sentence**

VI.Cause of Action: **Motion to Vacate Sentence pursuant to 28 U.S.C. 2255**

VII. Requested in Complaint

Class Action: **No**

Dollar Demand:

Jury Demand: **No**

VIII. This case **Is NOT** a refiling of a previously dismissed case. (If yes case number __ by Judge __)

Signature:

Date: 2/22/01

FILED-EOD 01 FEB 23 PM 1:04 CLERK U.S. DISTRICT COURT

DOCKETED FEB 26 2001

If any of this information is incorrect, please go back to the Civil Cover Sheet Input form using the *Back* button in your browser and change it. Once correct, print this form, sign and date it and submit it with your new civil action. **Note: You may need to adjust the font size**

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### Eastern Division

JUDGE GRADY

In the Matter of

United States

v.

Salvatore Lorefice

**01C 1243**

Case Number:  01 C _____

~~MAGISTRATE JUDGE ROSEMOND~~

APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR:

Salvatore Lorefice

**DOCKETED**

FEB 2 6 2001

| (A) | (B) |
|---|---|
| SIGNATURE | SIGNATURE |
| NAME Alan Ellis | NAME James R. Thompson |
| FIRM Law Offices of Alan Ellis | FIRM Winston & Strawn |
| STREET ADDRESS 34 Issaquah Dock | STREET ADDRESS 35 West Wacker Drive |
| CITY/STATE/ZIP Sausalito, CA   94965 | CITY/STATE/ZIP Chicago, IL  60601 |
| TELEPHONE NUMBER (415) 332-6464 | TELEPHONE NUMBER (312) 558-5600 |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 02823837 |
| MEMBER OF TRIAL BAR?   YES [ ]   NO [✓] | MEMBER OF TRIAL BAR?   YES [✓]   NO [ ] |
| TRIAL ATTORNEY?   YES [ ]   NO [✓] | TRIAL ATTORNEY?   YES [✓]   NO [ ] |
|  | DESIGNATED AS LOCAL COUNSEL?   YES [✓]   NO [ ] |
| (C) | (D) |
| SIGNATURE | SIGNATURE |
| NAME Michael B. Johnson | NAME |
| FIRM SAME AS B | FIRM |
| STREET ADDRESS | STREET ADDRESS |
| CITY/STATE/ZIP | CITY/STATE/ZIP |
| TELEPHONE NUMBER | TELEPHONE NUMBER |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 6243194 | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) |
| MEMBER OF TRIAL BAR?   YES [ ]   NO [✓] | MEMBER OF TRIAL BAR?   YES [ ]   NO [ ] |
| TRIAL ATTORNEY?   YES [ ]   NO [✓] | TRIAL ATTORNEY?   YES [ ]   NO [ ] |
| DESIGNATED AS LOCAL COUNSEL?   YES [ ]   NO [✓] | DESIGNATED AS LOCAL COUNSEL?   YES [ ]   NO [ ] |